The DETROIT MEDICAL CENTER, a Michigan non-profit corporation, Plaintiff,

v.

PROVIDER HEALTHNET SERVICES, INC., a Delaware corporation, Defendant.

No. CIV.A.03–188–JJF.

United States District Court, D. Delaware.

June 12, 2003.

Paul A. Bradley, Esquire of McCarter & English LLP, Wilmington, DE, Of Counsel: Marilyn A. Peters, Kathryn Humphrey and Brian M. Moore, Esquires of Dykema Gossett PLLC, Bloomfield Hills, Michigan, for Plaintiff.

Donald E. Reid and Jason A. Cincilla, Esquires of Morris, Nichols, Arsht & Tunnell, Wilmington, DE, Of Counsel: Michael P. Lynn, P.C. and John T. Cox II, Esquires of Lynn Tillotson & Pinker, LLP, Dallas, Texas, for Defendant.

### MEMORANDUM OPINION

FARNAN, District Judge.

Presently before the Court is Defendant's Motion to Dismiss or to Compel Arbitration (D.I. 8). For the reasons set forth below, the motion (D.I. 8) will be denied.

## I. Background

Plaintiff, Detroit Medical Center ("Detroit Medical"), is the primary health care provider to the urban population of Detroit, Michigan and is the largest healthcare provider in Southeast Michigan. (D.I. 10 at 3). Defendant, Provider Healthnet Services, Inc. ("Healthnet Services"), is a for profit Delaware corporation with its principal place of business in Dallas County, Texas. *Id.* Healthnet Services is in the business of providing and managing health information services to health care facilities. *Id.*

In 2001, Detroit Medical decided to outsource its health information management ("HIM") services to a third party. *Id.* HIM services ordinarily include all functions related to creating and using medical records such as: transcription of dictated charts, coding for reimbursement and insurance purposes, storage, retrieval, and archiving of records, collection of a single record across an entire system of related hospitals, verification of patient identity, billing and the creation of a fully electronic medical records system. *Id.* at 3–4.

On December 31, 2001, Detroit Medical and Healthnet Services entered into the Health Information Management Asset Purchase and Services Agreement ("Asset Agreement"). (D.I. 9 at 2). Exhibit D to the Asset Agreement is the Health Information Management Outsourcing Services

Agreement ("Services Agreement"), which was also executed on December 31, 2002, and was incorporated into the Asset Agreement and made apart of it for all purposes.[1] The Services Agreement provided for Healthnet Services to take over the management and operation of HIM services at Detroit Medical and its seven hospitals and one hundred clinics. (Amended Complaint, D.I. 4 at ¶ 7–10).

On February 11, 2003, Detroit Medical filed this action in the United States District Court for the District Court of Delaware alleging material breaches of both the Asset Agreement and Services Agreement and seeking rescission of both Agreements. *See* Amended Complaint, D.I. 4. Subsequently, Defendants filed a Motion to Dismiss or to Compel Arbitration. (D.I. 8). The parties submitted briefs outlining their respective positions and the Court heard oral argument from the parties. This Opinion sets forth the Court's findings of fact and conclusions of law with respect to the Defendant's Motion to Dismiss or to Compel Arbitration.

## II. The Parties' Contentions

The Defendant contends that the Plaintiff's Complaint should be dismissed for failure to state a claim upon which relief can be granted or alternatively that the Court should compel arbitration. (D.I. 9 at 2). First, Defendant argues that all of Detroit Medical's claims fall within the ambit of the arbitration provision of the Services Agreement which is incorporated into the Asset Agreement. *Id.* at 7. Second, Healthnet Services contends that Detroit Medical is attempting to circumvent its arbitration obligations by seeking equitable rescission under Delaware law. *Id.* at 8. Specifically, Healthnet Services con-

tends that under Delaware law, Detroit Medical's rescission claim alleges various breaches of contract, with available remedies at law, which can be effected by a monetary award and judicial order. *Id.*

Third, Healthnet Services contends that Detroit Medical has failed to state a claim for which relief can be granted because it cannot be restored to its original position. *Id.* at 11. Healthnet Services points out that rescission requires the restoration of both contracting parties to their respective positions prior to the execution of the contract at issue. *Id.* at 11. Accordingly, Healthnet Services contends, there are two conditions precedent to the granting of rescission: 1) the rescinding party must offer to restore the other party to its pre-contractual status; and 2) the court must be able to effectuate this restoration by decree. *Id.* (citations omitted). Healthnet Services contends that the second prong of this inquiry is not met in the instant case. Specifically, Healthnet Services argues that neither Detroit Medical nor this Court can restore Healthnet Services to its original position because the following benefits were provided to Detroit Medical, which are not returnable by judicial decree: 1) considerable implementation of an electronic medical record at Detroit Medical; 2) significant improvements of HIM, coding and transcription services; 3) the creation of new service level agreements and reporting systems; and 4) the retention and training of new employees. *Id.* at 12. Accordingly, Healthnet Services argues that Detroit Medical has failed to state a cause of action for which relief can be granted, and therefore, its claims must be dismissed.

---

1. Section 6.5 of the Asset Agreement states:
   The Exhibits and Schedules attached hereto and referred to herein are incorporated herein and made apart of this Agreement for all purposes.
   Asset Agreement § 6.5, D.I. 10, Ex. A.

In response, Detroit Medical contends that its claims are not subject to arbitration. (D.I. 10 at 10). First, Detroit Medical argues that arbitration is a matter of contract and the question of whether parties agreed to arbitrate, is a question for the court rather than an arbitrator to determine. *Id.* Second, Detroit Medical points out that the Asset Agreement has no arbitration provision and contends that the parties did not agree to arbitrate claims related to the Asset Agreement. *Id.* at 11. In regard to the claims relating to the Services Agreement, Detroit Medical contends that the arbitration provision is very narrow in scope and does not cover the equitable claims alleged in its Complaint. *Id.* at 13. Specifically, Detroit Medical contends that by its terms, the provision provides for arbitration only if the relief sought is non-equitable and is for monetary damages. Further, Detroit Medical argues that it has properly stated a claim for equitable rescission, which does not fall within the purview of the narrow arbitration provision in the Services Agreement. *Id.* at 13–16. Also, in regard to the equitable nature of its claims, Detroit Medical distinguishes the claims at issue from cases cited by Healthnet Services and points out that unlike the cases cited, Detroit Medical is not seeking both equitable relief and monetary damages. *Id.* at 18. Rather, Detroit Medical argues, it is seeking solely equitable relief.

## III. The Agreements

As background to understand the context of the dispute, the Court will outline the relevant provisions of the Agreements.

### A. The Asset Agreement's Provisions

The Asset Agreement, with regard to jurisdiction, states:

> This Agreement, and the rights and obligations of the parties hereto, will be governed by the laws of the State of Delaware, without regard to its conflicts of law doctrine. Any suit, action or other proceeding seeking to enforce any provision of, or based upon any right arising out of, in connection with or in any way relating to, this Agreement or the transactions contemplated hereby will be brought in the United States District Court for the District of Delaware. Each party hereby irrevocably consents and submits to the jurisdiction and venue of such court and irrevocably waives any objection which it may now or hereafter have to the venue of any suit, action or proceeding brought in such court and any claim that such suit, action or proceeding brought in such court has been brought in an inconvenient forum or such court lacks jurisdiction.

Asset Agreement § 6.3, D.I. 10, Ex. A at 13. The Asset Agreement does not contain an arbitration provision.

### B. The Services Agreement Provisions

The Services Agreement, which is Exhibit D to the Asset Agreement, and which is incorporated into the Asset Agreement contains a jurisdiction and arbitration provision. Specifically, § 14.3 of the Services Agreement states:

> This Agreement, and the rights and obligations of the parties hereto, will be governed by the laws of the State of Delaware, without regard to its conflict of law doctrine. With respect to any equitable suit, action or other proceeding seeking to enforce any provision of, or based upon any right arising out of, in connection with or in any way relating to this Agreement or the other transactions contemplated hereby will be brought in the United States District Court for the District of Delaware. Each party hereby irrevocably consents

and submits to the jurisdiction and venue of such court and irrevocably waives any objection which it may now have or hereafter have to the venue of any suit, action or proceeding brought in such court and any claim that such suit, action or proceeding brought in such court has been brought in an inconvenient forum or such court lacks jurisdiction. All other non-equitable actions or proceedings will be resolved pursuant to Section 11.4 and Section 11.5.

Services Agreement § 14.3, D.I. 10, Ex. B at 35. Sections 11.4 and 11.5 of the Services Agreement provide for a multi-step process to resolve non-equitable claimed breaches of the Services Agreement through internal meetings and mediation. *See* Services Agreement §§ 11.4, 11.5, D.I. 10, Ex. B at 30–31. Further, § 11.5(b) provides that "[a]ny such dispute or matter that has not been resolved as herein above provided or otherwise by agreement between the parties will be finally settled by arbitration conducted expeditiously within 60 days in accordance with *Schedule 11.5*." *See* Services Agreement § 11.5(b), D.I. 10, Ex. B at 31. Schedule § 11.5 of the Services Agreement provides for arbitration in certain matters. Specifically, it provides for arbitration when, "the relief sought by such party is for monetary damages or awards." *See* Services Agreement, Schedule 11.5, D.I. 10, Ex. C. Also, the paragraph entitled "Binding Arbitration" provides that:

Any controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be resolved by one arbitrator in binding arbitration by the American Arbitration Association in accordance with the most recent version of its Commercial Dispute Resolution Procedures. Any judgment or ruling rendered by the arbitrator(s) may be entered and enforced in any court having jurisdiction thereof. The entire arbitra-

tion process, measured from the date of filing of the demand for arbitration with the American Arbitration Association through the date of issuance of the ruling, shall be completed within 90 days.

Services Agreement, Schedule 11.5, D.I. 10, Ex. C. Further, Schedule 11.5 states that "[n]o determination or decision by the arbitrators pursuant to this Schedule 11.5 will limit or restrict the ability of any party hereto to obtain or seek in any appropriate forum, any relief or remedy that is not a monetary award or money damages." *Id.*

## IV. Discussion

The Supreme Court of Delaware has stated that when determining arbitrability, courts are limited to ascertaining whether the dispute is one that falls within the scope of the arbitration clause of the contract. *SBC Interactive, Inc. v. Corporate Media Partners*, 714 A.2d 758, 761 (Del. 1998). In *SBC Interactive*, the Delaware Supreme Court noted that courts may not consider any merits of the claim sought to be arbitrated and also explained that any doubts as to arbitrability are to be resolved in favor of arbitration. *Id.* However, the Supreme Court also pointed out that a court will not compel arbitration, absent a clear expression of such an intent. *Id.*

When the arbitrability of a claim is contested, the court is faced with two issues. *Parfi Holding, AB v. Mirror Image Internet, Inc.*, 817 A.2d 149, 155 (Del.2002). First, a court must determine whether an arbitration clause is broad or narrow in scope. *Id.* Second, the court must apply the relevant scope of the arbitration provision to the claim in order to determine whether the claim falls within the ambit of "the contractual provisions that require arbitration." *Id.* In addition, the instant situation requires the Court to determine whether the Services Agreement's arbitra-

tion provision also applies to claims arising under the Asset Agreement.

## A. Is the Arbitration Provision Narrow or Broad in Scope?

The Services Agreement's arbitration provision states that, "[a]ny controversy or claim arising out of or relating to this Agreement, or the breach thereof, shall be resolved by one arbitrator in binding arbitration by the American Arbitration Association in accordance with the most recent version of its Commercial Dispute Resolution Procedures." Services Agreement, Schedule 11.5, D.I. 10, Ex. C. Courts that have considered similar language in arbitration clauses have found that the "arising out of or relating to this Agreement" language is indicative of a broad arbitration provision. See, e.g., Karish v. SI International, Inc., C.A. No. 19501, 2002 WL 1402303 at *4, 2002 Del. Ch. Lexis 77 at *13 (Del. Ch. June 24, 2002) (finding that "arising out of or relating to" constitutes broad language in an arbitration provision); International Bayless v. Davox Corp., C.A. No. 17560, 2000 WL 268310 at *5, 2000 Del. Ch. Lexis 35 at *17–18 (Del. Ch. March 1, 2000)(finding that "arising out of or relating to" language in an arbitration provision was unambiguous and broad).[2] Applying this precedent, the Court concludes that the Services Agreement's arbitration provision is broad in scope.

The second step in the analysis is to determine whether the Services Agreement's broad arbitration provision can relate to claims arising from the Asset Agreement. On this issue, the Court finds

the Delaware Chancery Court's opinion in the Bayless v. Davox Corp. case persuasive. In Bayless, representatives of a class of stockholders brought an action to enforce the Class's alleged right to shares of Davoc corporation stock. Bayless, 2000 WL 268310, at *1, 2000 Del. Ch. Lexis 35 at *1. Under a merger and escrow agreement, the escrowed shares were set aside for security for certain post-merger claims that Davox might assert. Id. Absent Davox's compliance with the procedures for asserting and proving claims under the agreement, the escrowed shares were to be paid to the Class on the "release date". Id. The Class contended that since the release date passed, Davox had no contractual claim to the shares. Id., 2000 WL 268310 at *1, 2000 Del. Ch. Lexis 35 at *2. On the other hand, Davox contended that the Class could not assert this claim in court because the parties agreed to arbitrate any disputes about who was entitled to the escrow shares. Id. There were two agreements at issue in the Bayless case; an escrow agreement and a merger agreement. Id. Both the merger agreement and the escrow agreement contained dispute resolution provisions; however, the escrow agreement also contained an arbitration provision, while the merger agreement did not contain such a provision. Id., 2000 WL 268310 at *2, 2000 Del. Ch. Lexis 35 at *5–6. Also, Article X of the merger agreement was expressly incorporated into the escrow agreement. Id., 2000 WL 268310 at *1, 2000 Del. Ch. Lexis 35 at *4. Davox moved to dismiss the complaint on the grounds that the claims were arbitrable under the escrow agreement. Id., 2000

---

2. Although the Court recognizes, as the Plaintiff argued at oral argument, there are contractual provisions that limit the arbitration clause to suits for monetary damages, the arbitration clause/paragraph itself contains the words "arising out of or related to" and does not limit itself to monetary damages in that particular provision. As a result, the Court will construe the arbitration provision as a "broad" arbitration provision rather than a narrow one and consider the limiting contractual language in the context of whether the claims fall within the purview of the broad arbitration clause.

WL 268310 at *3, 2000 Del. Ch. Lexis 35 at *9. The Court considered several factors in determining whether the claims were arbitrable under the escrow agreement including: 1) the fact that all counts in the complaint at least "related to" the escrow agreement even if they did not directly "arise from" the escrow agreement; 2) § 11 of the escrow agreement expressly incorporated § 10 of the merger agreement; 3) the escrow agreement set forth a comprehensive scheme for addressing post-merger covered claims against escrowed shares; and 4) not arbitrating some of the claims would lead to a great deal of judicial inefficiency. *Id.*, 2000 WL 268310 at *4–5, 2000 Del. Ch. Lexis 35 at *15–18.

The Chancery Court rejected the Class's argument that since the merger agreement was the preeminent document in the transaction, the escrow agreement, along with its arbitration provision, should be viewed as a subsidiary document which only reached claims directly relating to the escrow agreement. *Id.*, 2000 WL 268310 at *4–5, 2000 Del. Ch. Lexis 35 at *15–19. Detroit Medical makes a similar argument in the present case, by contending that the Asset Agreement is the principal agreement in the case while the Services Agreement is a minor agreement, and as a result, the Services Agreement's arbitration provision should only be considered in relation to the claims directly arising out of the Services Agreement.

■ In the circumstances present here, the Court finds that several of the *Bayless* factors are present, including: 1) the Services Agreement is expressly incorporated into the Asset Agreement; 2) the Services Agreement provides for a multi-step dispute resolution scheme; and 3) there is a broad arbitration provision in the Services Agreement which covers claims "arising from or related to" the Agreement. Further, the Court finds that the Services Agreement, outlining the specific services to be provided, was clearly contemplated by the Asset Agreement which was executed on the same day, and therefore, the Court finds that the Services Agreement was essential to the overall transaction. Thus, in the Court's view, the use of the broad arbitration provision in the Services Agreement indicates an intent for the arbitration provision to reach the aspects of the transaction governed by contemporaneously executed documents, namely the Asset Agreement. *See, e.g., Personal Security & Safety Systems, Inc. v. Motorola, Inc.*, 297 F.3d 388, 390 (5th Cir.2002) (finding that a broad arbitration provision in a licensing agreement applied to claims under a stock purchase agreement because the agreements were executed together as part of the same overall transaction).

In sum, based on the broad arbitration provision in the Services Agreement and the fact that the agreements were executed contemporaneously as part of the same transaction, the Court concludes that the Services Agreement's arbitration provision applies to claims arising under the Asset Agreement because such claims clearly "relate to" the Services Agreement.

**B. Does the Claim Fall within the Contractual Provisions that Require Arbitration?**

■ Ordinarily the analysis would end with the determination that an arbitration provision is broad in nature and covers claims arising under a related agreement. However, there are also contractual provisions, not contained within the specific arbitration provision, which expressly limit the types of claims subject to arbitration. *See, e.g., Koob v. IDS Fin. Servs., Inc.*, 213 A.D.2d 26, 629 N.Y.S.2d 426, 432 (1st Dep't 1995) (ruling that despite a broad arbitration provision, since the agreement

expressly reserved the right to seek injunctive relief to enforce the restrictive covenant, the matter was removed from the authority of the arbitrator). Specifically, § 14.3 of the Services Agreement states in pertinent part:

> [w]ith respect to any equitable suit, action or other proceeding seeking to enforce any provision of, or based upon any right arising out of, in connection with or in any way relating to, this Agreement or the transactions contemplated hereby will be brought in the United States District Court for the District of Delaware.

Services Agreement § 14.3, D.I. 10, Ex. B at 35.

Further, the introductory paragraph in Schedule 11.5, which precedes the arbitration provision states:

> In the event that either party to this Agreement has any claim, right or cause of action against the other party to this Agreement, which the parties are unable to settle by Agreement between themselves, such claim right or cause of action, to the extent that the relief sought by such party is *for monetary damages or awards*, will be determined by binding arbitration in accordance with the provision of this *Schedule 11.5*.

Services Agreement, Schedule 11.5, D.I. 10, Ex. C (emphasis added).

Also, in a paragraph entitled "Relief in the Event of Bankruptcy or Non–Monetary Damages", Schedule 11.5 states, "[n]o determination or decision by the arbitrators pursuant to this *Schedule 11.5* will limit or restrict the ability of any party hereto to obtain or seek in any appropriate forum, any relief or remedy that is not a monetary award or money damages." Services Agreement, Schedule 11.5, D.I. 10, Ex. C.

Thus, despite the broad arbitration provision itself, the Court finds that the parties clearly intended to exclude from arbitration any equitable disputes "arising out of, in connection with, or in any way relating" to the transaction. Although public policy in Delaware favors arbitration, the Court cannot ignore the contract language and compel the parties to arbitrate disputes that they clearly did not intend to arbitrate.

As determined previously, all equitable actions stemming from both the Asset and Services Agreement are at issue because such actions clearly relate to the overall transaction, and therefore, the Court must determine whether Detroit Medical's action is equitable in nature and excluded from the reach of the arbitration provision.

■ Detroit Medical argues that it has properly asserted a claim for equitable rescission, and that Healthnet Services's attempt to characterize its claim as legal rather than equitable rescission is misplaced. Specifically, Detroit Medical contends that it is properly claiming equitable rescission and that this situation can be readily distinguished from the cases relied upon by Healthnet Services. For example, Detroit Medical contends that it will incur further liability from third parties absent cancellation of the agreements, and points out that it is not seeking monetary damages in addition to the "unwinding" of the contract. Detroit Medical also points out that it is currently a defendant in a class action lawsuit arising out of its inability to respond timely to requests for medical records. In response, Healthnet Services contends that Detroit Medical has labeled its cause of action as equitable rescission only to avoid and plead around the arbitration clause.

■ In Delaware, there are two conditions precedent to the granting of rescission: 1) the rescinding party must offer to

restore the other party to its precontractual status; and 2) the court must be able to effectuate this restoration by decree. *See, e.g., Hegarty v. American Commonwealths Power Corp.*, 163 A. 616 (Del.Ch.1932) (citing Black on Rescission and Cancellation (2d Ed.) § 616). If either the rescinding party is unwilling to restore the other nonrescinding party or if the Court is unable to restore the status quo ante by an order, than the moving party cannot seek rescission and must seek relief through damages. *See id.* at 620–621.

The Delaware Court of Chancery has outlined the difference between legal and equitable rescission. The Chancery Court has explained that legal rescission occurs when a court of law determines that the elements of a contract claim for rescission are proven and subsequently enters an order restoring the plaintiff to its original condition by awarding money or other property of which he had been deprived. *E.I. DuPont De Nemours & Co. v. HEM Research, Inc.*, Civ. A. No. 10747, 1989 WL 122053 at *3, 1989 Del. Ch. Lexis 132 at *8 (Del. Ch. October 13, 1989) (citing 12A C.J.S. Cancellation on Instruments § 4 1980). On the other hand, equitable rescission, which is sometimes referred to as cancellation, is a remedy where in addition to a judicial declaration that a contract is invalid and an award of money or property is given to restore the plaintiff to his original position, further equitable relief is required. *Id.* For example, the Chancery Court has explained, the remedy of equitable rescission usually requires the court to set aside an instrument, document, obligation or other matter affecting plaintiff's rights and/or liabilities, in order to restore the plaintiff to its original position. *Id.* (citing 3 J. Pomeroy, Pomeroy's Equity Jurisprudence (5th ed.1941) § 872 at 419–420). The Chancery Court further explained that equitable rescission would be appropriate where in the absence of cancellation of a document or instrument, the plaintiff would be exposed to liabilities from third parties not appearing in the action. *Id.* Additionally, the Chancery Court in *HEM Research*, noted that the doctrine would be applicable in a situation where a plaintiff is fraudulently induced to execute a note in favor of a defendant, and the only remedy that is adequate for the plaintiff is cancellation of the note to ensure that the defendant does not transfer the note to a bona fide purchaser, who could then recover from the plaintiff. *Id.* (citation omitted).

In the instant case, Detroit Medical has alleged that Healthnet Services has committed numerous substantial breaches of the Asset Agreement and related Services Agreements, including but not limited to failing to develop an EMR system, failing to sustain historical and interim service level agreements for the critical HIM services, failing to establish interim service level agreements for all HIM services, failing to maintain an inactive medical records center, and failing to secure and implement an active medical records center. (Amended Complaint, D.I. 4, ¶ 27–73). As a result, Detroit Medical contends that Healthnet Services has frustrated and defeated the intended purposes of the Asset Agreement. (Amended Complaint, D.I. 4, ¶ 75–77). In its prayer for relief, Detroit Medical requests the Court to enter an Order declaring that the Asset, Services, and other related agreements entered into by the parties on December 31, 2001 are rescinded. Also, Detroit Medical requests the Court to enter an order restoring Detroit Medical and Healthnet Services to their positions before the agreements were entered into on December 31, 2001, by requiring: a) Healthnet Services to return to Detroit Medical all of the acquired assets, rights, businesses and staff of Detroit Medical's HIM Departments listed in Sec-

tion 1.2 of the Asset Agreement; and b) Detroit Medical to return to Healthnet Services the cash, shares of Healthnet Services Series B Preferred Stock and shares of Healthnet Services listed in Section 1.2 of the Asset Agreement. Finally, Detroit Medical requests the Court to award further equitable relief as the Court deems just. (Amended Complaint, D.I. 4, at 24).

Here, although the Court recognizes that the mere incantation of the magical words "equitable rescission" should not mandate a decision in Detroit Medical's favor, after reviewing the Complaint and the parties' contentions, the Court concludes that Detroit Medical's claim is equitable in nature, and therefore, expressly excluded from the reach of the arbitration provision.

First, the Court concludes that absent cancellation of the Asset, Services and related agreements, Detroit Medical would be subjected to third party liability as discussed in the *HEM Research* case, and as exemplified by the class action lawsuit filed against Detroit Medical arising out of its alleged inability to timely respond to requests for medical records, eight months after Healthnet Services took over the HIM operations, and its exposure to future liability if it is not able to outsource its HIM Services to another vendor. Also, despite Healthnet Services' attempt to distinguish the instant circumstances from a situation where a bona fide purchaser of a note may be involved, the Court finds the absence of a future bona fide purchaser in the analysis irrelevant. The Court concludes that Detroit Medical could still be exposed to future liability from third parties if the Asset and related Agreements remain in effect. Thus, the Court concludes that the absence of a bona fide purchaser is not a critical requirement if the exposure to future liability is demonstrated by the party seeking cancellation.

■ With regard to the ability of the Court to place the parties in substantially the same respective positions as prior to the Agreements, the Court concludes that Detroit Medical has demonstrated that Healthnet Services can be restored to its precontractual status and the Court will be able to effectuate a substantial restoration by a decree. Under Delaware law, rescission requires the substantial rather than the complete restoration of both contracting parties to their respective positions before executing the contract. *See Obara v. Moseley*, 692 A.2d 414 (Del.1997)(Table) (stating "[t]he court must substantially restore the prior position of all parties in its grant of rescissionary relief.").

In the case at bar, Detroit Medical has offered to return the cash and shares that it has acquired as a result of the transaction and has asked the Court to order the return of its assets and businesses. In opposing Detroit Medical's offer, Healthnet Services contends that the Court cannot restore it to its precontractual position because: 1) there has been considerable implementation of an electronic medical record at Detroit Medical; 2) significant improvements of HIM, coding, and transcription services; 3) the creation of new service level agreements and reporting systems; and 4) the retention and training of new employees. (D.I. 9 at 12). In rebuttal, Detroit Medical contends that Healthnet Services has substantially failed to implement any of the above quoted services. Accepting Detroit Medical's assertions regarding restoration as true, as the Court must at this juncture, the Court concludes that the return of the cash and shares that Detroit Medical acquired in the transaction will "substantially", if not completely return Healthnet Services to its precontractual position. *See Colburn v. Upper Darby Township*, 838 F.2d 663, 665–666 (3d Cir.1988) (noting that in a motion to dismiss the court should accept all well-pled allegations as true, and when

viewing the complaint in the light most favorable to the non-moving party determine "whether, under any reasonable reading of the pleadings, the plaintiff may be entitled to relief.")

The Court reaches this conclusion because it concludes that the cases relied upon by Healthnet Services are inapposite to the instant situation. For example, in *Dervaes v. H.W. Booker Construction Co.,* 1980 WL 333053 (Del.Super.Ct.1980), plaintiffs brought suit to recover damages arising from their contract with the defendant to build a home. They also requested cancellation of the contract. The Court ruled that plaintiffs' claim for rescission failed because the plaintiffs, in their pleadings, failed to offer to restore the defendant to the status quo ante. *Dervaes,* 1980 WL 333053 at *11. Also, in *Ross Systems Corporation v. Ross,* 1993 WL 49778 (Del. Ch.1993), in a dispute between two principle stockholders of a company, plaintiff sought to recover "every cent he invested in the company" and also sought to retain his stock in the company. *Ross,* 1993 WL 49778 at *24. In *Ross,* the court denied rescissory damages and noted that the problem was that the moving party also sought to retain his stock. The court in *Ross* further explained that if the Defendant is compelled to return the plaintiff's original investment, the plaintiff must also surrender his stock, where "[e]quity requires no less." *Id.* at *25. The Court concludes that the instant situation is distinguishable from these cases because Detroit Medical has offered in its pleadings, to return Healthnet Services to the status quo ante by returning all cash and stock acquired from the transaction unlike the plaintiffs in *Dervaes* and *Ross.* Detroit Medical has only asked to "unwind" the contract and has not sought any additional monetary damages. The Court finds that the plaintiffs in *Ross* and *Dervaes* sought equitable remedies and money damages which is different from the relief sought by Detroit Medical in this case. Detroit Medical is offering to return all monies and stock acquired in the transaction and simply cancel the transaction. Based on these differences, and the fact that Detroit Medical has fulfilled the requirements of pleading a claim for equitable rescission, the Court concludes that the Motion to Dismiss or Compel Arbitration must be denied because the Court is the proper forum to hear the equitable claim asserted by Detroit Medical arising from or related to the Asset and Services Agreements between Detroit Medical and Healthnet Services.

An appropriate Order will be entered.

## ORDER

At Wilmington this 12th day of June 2003, for the reasons set forth in the Memorandum Opinion issued this date, IT IS HEREBY ORDERED that Provider Healthnet Services, Inc.'s Motion to Dismiss or Compel Arbitration (D.I. 8) is *DENIED.*