# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE TESLA, INC. | § | |
| DERIVATIVE LITIGATION | § | No. 534, 2024 |
| | § | No. 10, 2025 |
| | § | No. 11, 2025 |
| | § | No. 12, 2025 |
| | § | |
| | § | Court Below: Court of Chancery |
| | § | of the State of Delaware |
| | § | |
| | § | C.A. No. 2018-0408 |

Submitted: October 15, 2025
Decided: December 19, 2025

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED IN PART, REVERSED IN PART**.

David E. Ross, Esquire, Garrett B. Moritz, Esquire, Thomas C. Mandracchia, Esquire, ROSS ARONSTAM & MORITZ LLP, Wilmington, Delaware; Michael A. Barlow, Esquire, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Wilmington, Delaware; Alex Spiro, Esquire, Christopher D. Kercher, Esquire, QUINN EMANUEL URQUHART & SULLIVAN, LLP, New York, New York; Christopher G. Michel, Esquire *(argued)*, QUINN EMANUEL URQUHART & SULLIVAN, LLP, Washington, D.C.; Daniel Slifkin, Esquire, Vanessa A. Lavely, Esquire, CRAVATH, SWAINE & MOORE LLP, New York, New York *for Defendants Below/Appellants Elon Musk, Robyn M. Denholm, Antonio J. Gracias, James Murdoch, Linda Johnson Rice, Brad W. Buss, and Ira Ehrenpreis*.

Rudolf Koch, Esquire, John D. Hendershot, Esquire, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; William M. Lafferty, Esquire, Susan W. Waesco, Esquire, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; John L. Reed, Esquire, Ronald N. Brown, III, Esquire, DLA PIPER LLP (US), Wilmington, Delaware; Catherine A. Gaul, Esquire, ASHBY & GEDDES, P.A., Wilmington, Delaware; Jeffrey B. Wall, Esquire *(argued)*, Morgan L. Ratner, Esquire, SULLIVAN & CROMWELL LLP, Washington, D.C.; Brian T. Frawley,

Esquire, Matthew A. Schwartz, Esquire, SULLIVAN & CROMWELL LLP, New York, New York *for Defendants Below/Appellants Tesla, Inc.*

Gregory V. Varallo, Esquire *(argued)*, BERNSTEIN LITOWITZ BERGER & GROSSMANN LLP, Wilmington, Delaware; Peter B. Andrews, Esquire, Craig J. Springer, Esquire, David M. Sborz, Esquire, Andrew J. Peach, Esquire, Jackson E. Warren, Esquire, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Jeroen van Kwawegen, Esquire, Thomas G. James, Esquire, BERNSTEIN LITOWITZ BERGER & GROSSMAN LLP, New York, New York; Jeremy S. Friedman, Esquire, Spencer M. Oster, Esquire, David F.E. Tejtel, Esquire, FRIEDMAN OSTER & TEJTEL PLLC, Bedford Hills, New York *for Plaintiff-Below/Appellee*.

Anthony A. Rickey, Esquire, MARGRAVE LAW LLC, Wilmington, Delaware; Donald B. Verrilli, Esquire, Elaine J. Goldenberg, Esquire, MUNGER, TOLLES & OLSON LLP, Washington, D.C.; Achyut J. Phadke, Esquire, MUNGER, TOLLES & OLSON LLP, San Francisco, California; Joseph A. Grundfest, Esquire, STANFORD LAW SCHOOL, Stanford, California *for Objector-Appellant Amy Steffens*.

David S. Eagle, Esquire, Sally E. Veghte, Esquire, KLEHR HARRISON HARVEY BRANZBURG LLP, Wilmington, Delaware; Thomas R. Grady, Esquire, GRADYLAW, Naples, Florida *for Objector-Appellants ARK Investment Management LLC, David Israel, and Kurt Panouses*.

Francis G.X. Pileggi, Esquire, Scott D. Cousins, Esquire, Sean B. Brennecke, Esquire, LEWIS BRISBOIS BISGAARD & SMITH LLP, Wilmington, Delaware; Ari Holtzblatt, Esquire, Peter A. Kallis, Esquire, WILMER CUTLER PICKERING HALE AND DORR LLP, Washington, D.C.; Kyle T. Edwards, Esquire, WILMER CUTLER PICKERING HALE AND DORR LLP, San Francisco, California *for Amici Curiae Tesla Retail Stockholders, in support of Appellants*.

Laura H. McNally, Esquire, MORGAN, LEWIS & BOCKIUS LLP, Wilmington, Delaware *for Amici Curiae Current and Retired Practitioners and Professors, in support of Appellants*.

Daniel A. Griffith, Esquire, WHITEFORD TAYLOR & PRESTON LLC, Wilmington, Delaware; Steven M. Haas, Esquire, Johnathon E. Schronce, Esquire, James M. Lockerby, Esquire, HUNTON ANDREWS KURTH LLP, Richmond, Virginia *for Amicus Curiae, Chamber of Commerce of the United States of America, in support of Appellants*.

Theodore A. Kittila, Esquire, HALLORAN FARKAS + KITTILA LLP, Wilmington, Delaware; Randy D. Gordon, Esquire, Lucas C. Wohlford, Esquire, DUANE MORRIS LLP, Dallas, Texas *for Amicus Curiae Texas Association of Business, in support of Appellants*.

Rebecca L. Butcher, Esquire, LANDIS RATH & COBB LLP, Wilmington, Delaware; Cory L. Andrews, Esquire, WASHINGTON LEGAL FOUNDATION, Washington, D.C. *for Amicus Curiae Washington Legal Foundation, in support of Appellants*.

Michael L. Vild, Esquire, CROSS & SIMON, LLC, Wilmington, Delaware; Stephen Blake, Esquire, SIMPSON THACHER & BARTLETT LLP, Palo Alto, California *for Amicus Curiae Sequoia Capital Operations, LLC, in support of Appellants*.

Ned Weinberger, Esquire, Mark D. Richardson, Esquire, LABATON KELLER SUCHAROW LLP, Wilmington, Delaware *for Amici Curiae Corporate Law Academics, in support of Appellee.*

Christine M. Mackintosh, Esquire, GRANT & EISENHOFER, P.A., Wilmington, Delaware; Joel Fleming, Esquire, Amanda Crawford, Esquire, EQUITY LITIGATION GROUP LLP, Boston, Massachusetts *for Amicus Curiae Charles M. Elson, in support of Appellee*.

*PER CURIAM***:**

## I. INTRODUCTION

In 2018, the Tesla, Inc. Board of Directors and Tesla stockholders approved an equity compensation plan for Elon Musk, the company's chief executive officer. The plan included twelve tranches of stock options that vested after reaching market capitalization and operational milestones.

A Tesla stockholder filed a derivative lawsuit against Musk and the Tesla directors who approved the plan. The Plaintiff alleged that Musk, as a controlling stockholder, forced the Tesla Board to grant him excessive compensation. Following a five-day trial, the Court of Chancery agreed. Applying the most rigorous standard of review for conflicted corporate transactions, the court concluded that the Director Defendants failed to prove that the compensation plan was entirely fair to Tesla and its stockholders. The court also faulted the Board for misleading disclosures to stockholders who approved the compensation plan. It ordered rescission of the plan.

After a special committee process, the Tesla Board resubmitted the rescinded compensation plan for a second stockholder vote along with new disclosures, including a copy of the court's opinion granting rescission. A majority of disinterested shares voted for the plan. With a second stockholder approval in hand, the Director Defendants asked the Court of Chancery to undo its post-trial opinion.

4

The court refused, entered judgment for the Plaintiff granting rescission of the plan, and awarded attorneys' fees to the Plaintiff's counsel.

On appeal, the Director Defendants argue that the Court of Chancery erred by finding that Musk was a controlling stockholder and therefore entire fairness review applied, holding that the award was unfair, and granting rescission. Tesla argues that the court erred by refusing to revise its post-trial opinion to give effect to the second stockholder vote and awarding the Plaintiff's counsel excessive fees.

For the reasons explained below, we reverse the remedy chosen by the Court of Chancery – rescission of the 2018 compensation plan. We reinstate the 2018 plan and award the Plaintiff nominal damages. We also award the Plaintiff's counsel fees based on *quantum meruit* and expenses.

## II. FACTUAL AND PROCEDURAL BACKGROUND

We rely on the facts as found by the Court of Chancery after trial.[1] Tesla is a clean-energy company that designs, develops, manufactures, sells, and leases electric vehicles and energy products. Musk invested in Tesla in 2004, served as chairman of the Board between 2004 and 2018, and became chief executive officer in 2008. Before the 2018 transaction in question, the Board awarded Musk two

---

[1] *Tornetta v. Musk*, 310 A.3d 430 (Del. Ch. 2024) [*Post-Trial Op.*]; *Tornetta v. Musk*, 326 A.3d 1203 (Del. Ch. 2024) [*Ratification and Fee Op.*].

5

previous equity-linked compensation plans, the first in 2009 ("2009 Grant"), and another in 2012 ("2012 Grant").

## A. *The 2009 Grant.*

The 2009 Grant, which the Tesla Board approved in December 2009, was divided into two parts, "each of which offered Musk stock options to purchase 4% of Tesla's fully diluted shares as measured at the grant date."[2] The first part was employment-based: 1/4th vested at the grant date; and 1/48th vested each month over the next three years contingent on Musk's continued employment with Tesla.[3] The second part was performance-based: it required Tesla to meet certain milestones (within four years) related to the Model S, culminating in "completion of the 10,000th Model S Production Vehicle."[4] It is undisputed that Musk timely satisfied each of the 2009 Grant's performance milestones.

## B. *The 2012 Grant.*

The 2012 Grant, which the Tesla Board approved in August 2012, was entirely performance-based, and included ten tranches, "each offering options representing 0.5% of Tesla's outstanding common stock as of August 2012."[5] Each tranche

---

[2] *Post-Trial Op.* at 453.

[3] *Id.*

[4] *Id.*

[5] *Id.*

required Musk to pair an "operational milestone" (or, "specified product-related goals") with a "market capitalization milestone."[6]  Notably, each market capitalization milestone required Tesla's market capitalization to increase by $4 billion – not an insignificant amount considering at the time the 2012 Grant was approved, Tesla's market capitalization was $3.2 billion.[7]  Musk had ten years to complete these milestones.  It is undisputed that by March 2017, seven of the ten tranches had vested, and Tesla's market capitalization was about $53 billion.[8]

## C. *The Challenged 2018 Grant.*

As Musk closed in on completion of the 2012 Grant milestones, on January 21, 2018, the Board held a special meeting to approve Musk's third compensation plan (the "2018 Grant" or the "Grant").[9]  Musk and his brother, Kimbal Musk, recused themselves from the meeting.  Steve Jurvetson was on leave.  The rest of the Board – Ira Ehrenpreis, Robyn Denholm, Antonio Gracias, Brad Buss, James Murdoch, and Linda Johnson Rice – unanimously approved the 2018 Grant.[10]

---

[6] *Id.*

[7] *Id.*

[8] *Id.* at 453–54.

[9] *Id.* at 485.

[10] *Id.* at 485–86.

The 2018 Grant has twelve vesting tranches.[11] Each tranche vested upon meeting one market capitalization milestone and one operational milestone.[12] The market capitalization milestones began at $100 billion and increase in $50 billion increments before ending at $650 billion.[13] Of the sixteen operational milestones, eight were revenue-based and eight are adjusted EBITDA-based.[14] To vest, achieving any one of the operational milestones could be paired with achieving any one of the market capitalization milestones.[15] The operational milestones increments are shown in the table below.[16]

|   | Revenue-Based Operational Milestones (in billions) | Adjusted EBITDA-Based Operational Milestones (in billions) |
|---|---|---|
| 1 | $20.0 | $1.5 |
| 2 | $35.0 | $3.0 |
| 3 | $55.0 | $4.5 |
| 4 | $75.0 | $6.0 |
| 5 | $100.0 | $8.0 |
| 6 | $125.0 | $10.0 |
| 7 | $150.0 | $12.0 |
| 8 | $175.0 | $14.0 |

---

[11] Joint App. to Opening Brs. at A4150 [hereinafter A_] (JX-878 at 52 (Feb. 18, 2018 Schedule 14A Proxy Statement) [JX-878]).

[12] *Id.*

[13] *Id.* at A4151 (JX-878 at 53).

[14] *Post-Trial Op.* at 486.

[15] A4150 (JX-878 at 52).

[16] *Post-Trial Op.* at 486.

Tesla had to achieve one market capitalization milestone and one operational milestone to complete each tranche.[17] With each completed tranche, Musk earned options to purchase 1% of Tesla's common stock outstanding as of January 19, 2018. Before a five-for-one stock split in 2020 and a three-for-one stock split in 2022, the 1% equaled 1,688,670 shares.[18] The fully-vested 2018 Grant would give Musk options to purchase 20,264,042 (pre-split) shares.[19] The strike price was $350.02, Tesla common stock's closing price on January 19, 2018.[20] Adjusting for two stock splits, the strike price was $23.33.[21] The 2018 Grant included a claw back provision, a leadership requirement, an M&A adjustment, and a five-year hold period. Like the 2012 Grant, the 2018 Grant expired after ten years.[22]

## D. *A Majority of Disinterested Stockholders Approve the 2018 Grant.*

The Board conditioned the 2018 Grant on approval by a majority vote of disinterested stockholders. The stockholders approved the 2018 Grant at a special

---

[17] *Id.*

[18] *Id.* at 486–87.

[19] *Id.*

[20] *Id.*

[21] Calculated as $350.02 divided by (5 x 3).

[22] A4150 (JX-878 at 52) (stating that the 2018 Grant expires on January 20, 2028); *Post-Trial Op.* at 453 n.74 (citing JX-137 at 1 (noting that the 2012 Grant expired on August 13, 2022)).

stockholder meeting on March 21, 2018, with 73% of votes cast in favor at the meeting (excluding Musk's and Kimbal's ownership).[23]

### E. *Musk Meets All Requirements Under the 2018 Grant.*

The parties stipulated in the pre-trial order that, as of June 30, 2022, all market capitalization milestones and eleven operational milestones had been achieved, along with one revenue milestone (*i.e.*, $75 billion in revenue) which "remained probable of achievement."[24] Tesla's Form 10-K for the fiscal year ended December 31, 2023 reported that the $75 billion revenue milestone had been achieved.[25] Since then, the Plaintiff has acknowledged that "[b]y January 2023, all 303,960,630 options were vested and in-the-money."[26] Thus, Musk fully performed under the 2018 Grant.

### F. *The Court of Chancery Lawsuit.*

On June 5, 2018, a Tesla stockholder filed suit in the Court of Chancery. In Count I, the Plaintiff alleged that Musk breached his fiduciary duties as a controlling stockholder of Tesla by forcing the Board to approve the 2018 Grant. Count II claimed that Tesla's Board – including Musk, Kimbal, and Jurvetson – breached their fiduciary duties by approving the 2018 Grant. In Count III, the Plaintiff alleged

---

[23] *Post-Trial Op.* at 490.

[24] A0486 (Stipulation and Pre-Trial Order ¶ 276).

[25] A2603 (Decl. of Daniel R. Fischel at 40).

[26] Answering Br. 24.

10

unjust enrichment against Musk. Finally, in Count IV, the Plaintiff alleged waste. Counts I and II were asserted as both direct and derivative claims. Counts III and IV were asserted as derivative claims only.

After the Court of Chancery denied the Defendants' motion to dismiss Counts I through III, the case proceeded to discovery. On September 20, 2021, this Court issued *Brookfield Asset Management, Inc. v. Rosson*.[27] In *Brookfield*, we held that overpayment or dilution of voting power claims are derivative, not direct, claims.[28] As a result of *Brookfield*, the Court of Chancery permitted the Plaintiff to file an amended complaint asserting the same claims, with Counts I and II recast as entirely derivative. The court approved a stipulation that dismissed the direct components of Counts I and II and dismissed the claims against Kimbal and Jurvetson with prejudice.[29]

### 1. *The Post-Trial Liability Determination.*

In November 2022, the Court of Chancery held a five-day trial. In its post-trial opinion, the Court of Chancery found for the Plaintiff. The court first examined whether Musk was a controlling stockholder. It concluded that Musk controlled only

---

[27] 261 A.3d 1251 (Del. 2021).

[28] *Id.* at 1267–68.

[29] Stipulation and Order Governing Decertification of Class, Dismissal with Prejudice of Direct Claims, and Schedule and Terms for Plaintiff's Mot. for Leave to File Verified Am. Deriv. Compl. ¶ 3, *Tornetta v. Musk*, C.A. No. 2018-0408 (Del. Ch. Oct. 27, 2021), Dkt. No. 175 (dismissing claims with prejudice).

21.9% of Tesla's voting power and therefore lacked mathematical voting control, or "hard" control. But the court found that Musk exercised transaction-specific control over the 2018 Grant. The court observed that "Musk wield[ed] considerable power in the boardroom by virtue of his high-status roles and managerial supremacy."[30]

The Court of Chancery pointed to several aspects of the approval process which led it to conclude that Musk controlled the negotiations over the 2018 Grant. The court found that Musk controlled the timing of the process, accelerating and decelerating the pace as he requested. The court also stated that "[t]he most striking omission from the process is the absence of any evidence of adversarial negotiations between the Board and Musk concerning the size of the Grant."[31] And, according to the court, there was no meaningful negotiation over other aspects of the Grant. Finally, the court noted the lack of a traditional benchmarking analysis comparing the 2018 Grant to plans at comparable firms. The court was not persuaded by the Defendants' argument that no comparable firms existed. According to the court, "the extraordinary nature of the Grant should have made benchmarking *more* critical, not less," because, if nothing else, it would have informed the

---

[30] *Post-Trial Op.* at 504.

[31] *Id.* at 513.

12

decisionmakers of the magnitude of difference between the sizes of the 2018 Grant and comparable plans.[32]

Having found that Musk exercised transaction-specific control over the 2018 Grant, the Court of Chancery subjected it to the entire fairness standard of review. First, the court declined to permit the Defendants to shift the burden of persuasion under *Kahn v. Lynch Communication Systems, Inc.*[33] According to the court, the 2018 Grant was not approved by a well-functioning committee of independent directors. The court also decided that, because the Defendants failed to disclose material information concerning director conflicts and process flaws in the first proxy, the 2018 Grant was not approved by an informed vote of a majority of the minority shareholders. The court also concluded that the Defendants failed to demonstrate that the transaction was entirely fair.[34]

### 2. *The Parties' Rescission Arguments Before the Court of Chancery*.

In his original complaint, the Plaintiff sought to rescind the 2018 Grant or to reform it to correlate with comparable CEO pay packages. But in his post-trial brief, the Plaintiff abandoned the alternative remedy and sought only to rescind the 2018 Grant. The Plaintiff argued that because the process leading to the 2018 Grant was

---

[32] *Id.* at 519.

[33] 638 A.2d 1110 (Del. 1994).

[34] *Post-Trial Op.* at 544.

"so divorced" from fair dealing and fair compensation, it should be invalidated and the stock options rescinded.[35] In the alternative, the Plaintiff argued that, at a minimum, the court should equitably modify the 2018 Grant's terms and rescind the options underlying the 2018 Grant's first three tranches. According to the Plaintiff, the first three tranches should have been equitably rescinded because the first proxy's claims about the feasibility of reaching those milestones were false, and therefore, the stockholder approval was invalid. The Plaintiff also argued that, because the 2018 Grant was conditioned upon stockholder approval, a single material disclosure failure was sufficient to invalidate the Grant.

In their post-trial answering brief, the Director Defendants argued that the Plaintiff's proposed rescission remedy of the entire 2018 Grant, or his alternative remedy of nullifying its first three tranches, "would be inequitable."[36] They contended that both of the Plaintiff's proposed remedies were inequitable because Musk had already "delivered on his end of the bargain" by completing those tranches' milestones.[37]

---

[35] A1401 (Plaintiff's Post-Trial Br. 2).

[36] A1596 (Director Defendants' Answering Post-Trial Br. 7).

[37] *Id.*

14

### 3. *The Court of Chancery Orders Rescission.*

As a remedy for breach of fiduciary duties, the Court of Chancery ordered rescission of the 2018 Grant. It found that rescission was "reasonable, appropriate, and practicable" because the 2018 Grant was "not 'too complex to unscramble[.]'"[38] Rescission was an appropriate remedy, or "uniquely available," according to the court, because it was possible for all parties in the transaction to be restored to the *status quo ante*. Relying on its broad discretion to grant rescission, the court found that "no third-party interests are implicated, the entire Grant sits unexercised and undisturbed, and exercised shares would be subject to the Five-Year Hold Period."[39] The court also observed that rescission is the "preferrable remedy" in the context of a breach of fiduciary duty when one party has materially misled and induced a party to enter into a contract.[40]

Finally, the court dismissed the Defendants' argument that rescission was an inappropriate remedy because it would leave Musk uncompensated for his almost six years of effort. It pointed to Musk's preexisting equity stake that would provide

---

[38] *Post-Trial Op.* at 547 (quoting *In re Sunbelt Beverage Corp. S'holder Litig.*, 2010 WL 26539, at *14 (Del. Ch. Jan. 5, 2010), *as revised* (Feb. 15, 2010)) (alteration in original).

[39] *Id.*

[40] *Id.* (citing *Lynch v. Vickers Energy Corp.*, 429 A.2d 497, 501 (Del. 1981) (noting that rescission "calls for the cancellation of the bargain and the reform of the parties to the status quo"), *overruled on other grounds by Weinberger v. UOP, Inc.*, 457 A.2d 701, 703–04, 714 (Del. 1983)).

him with "tens of billions of dollars" for his work.[41]  The court also emphasized that the Defendants did not offer a viable alternative remedy to leaving the entirety of the 2018 Grant intact.

### 4. *The Second Stockholder Vote.*

After the Court of Chancery issued its post-trial opinion, Musk declared that Tesla would "move immediately to hold a shareholder vote to transfer state of incorporation to Texas."[42]  On February 10, 2024, the Tesla Board formed a special committee to consider Musk's reincorporation proposal.  At first, the special committee consisted of Kathleen Wilson-Thompson and Joe Gebbia, but Gebbia later stepped down due to potential independence concerns.  Wilson-Thompson became the only special committee member.

The Board initially tasked the special committee with making recommendations on whether, and if so where, Tesla should reincorporate.[43]  The special committee, however, decided that the decision whether to reincorporate was

---

[41] *Id.*

[42] Elon Musk (@elonmusk), X F/K/A TWITTER (Feb. 1, 2024, 12:09 AM), https://x.com/elonmusk/status/1752922071229722990.

[43] App. to Answering Br. at B3967 [hereinafter B_] (April 29, 2024 Tesla, Inc. Schedule 14A Proxy at 18 ["Second Proxy"]) ("The Board charged the Committee with considering whether it would be in the best interests of the Company and its stockholders to change its corporate domicile, and if so, to which jurisdiction.").

intertwined with the question of Musk's compensation.[44]  It therefore requested that the Board also consider whether stockholders should vote to "ratify" the 2018 Grant.[45]  The Board approved the request.

After eight weeks, the special committee concluded that "reincorporating in Texas and ratifying Musk's [2018 Grant] compensation are in the best interests of Tesla and all of its stockholders, and should be voted for by stockholders at Tesla's 2024 annual meeting."[46]  The special committee also recommended that both Elon and Kimbal Musk recuse themselves from decision-making on either vote, that each initiative be conditioned on a majority vote of disinterested stockholders,[47] and that "the Board recommend that stockholders vote for reincorporation [and] . . . . ratification based on the Committee's determination that" each initiative was "in the best interests of Tesla and all of its stockholders."[48]

---

[44] B3968 (*Id*. at 19) ("As the Special Committee considered the redomestication question, it concluded that if it made a determination to redomesticate, Mr. Musk's compensation should also be addressed in some way at the same time.").

[45] *Id*. ("[T]he Board delegated additional authority to the Special Committee to decide whether, if there is a stockholder vote on redomestication, Mr. Musk's 2018 CEO Performance Award should be ratified at the same time . . . .").

[46] B4197 (JX-878 at E-40 (Annex E to Second Proxy – Special Committee Report)).

[47] Described in the Special Committee Report as "non-Musk-affiliated stockholders" for the reincorporation vote. *Id*.

[48] *Id*.

On April 29, 2024, Tesla filed a proxy statement ("Second Proxy") recommending that its stockholders "ratify" the rescinded 2018 Grant.[49] The Second Proxy provided several reasons for ratification, including a potential "accounting charge in excess of $25 billion" if Tesla had to formulate a new pay package.[50] The Second Proxy also included a complete copy of the Court of Chancery's opinion, finding that Musk and the Director Defendants breached their fiduciary duties by approving the 2018 Grant. A majority of Tesla's present and disinterested shares voted in favor of the proposal at Tesla's June 13, 2024 annual meeting ("Second Stockholder Vote").

### 5. *The Motion to Revise.*

On June 28, 2024, the Director Defendants filed a motion to revise the post-trial opinion ("Motion to Revise"). They argued that the Second Stockholder Vote effectively ratified the 2018 Grant. Tesla joined the argument and added that the Second Stockholder Vote mooted this action.

---

[49] Concerned that Tesla would use the reincorporation vote to evade the court's judgment, the Plaintiff filed four emergency motions. *Ratification and Fee Op.* at 1218. Tesla responded that the reincorporation vote would "not affect any obligations or liabilities [Tesla] incurred prior to the conversion or the personal liability of any person incurred prior to the conversion, nor will it affect the choice of law applicable to [Tesla] with respect to matters arising prior to the conversion." Letter Decision at 5, *Tornetta v. Musk*, C.A. No. 2018-0408 (Del. Ch. May 28, 2024), Dkt. No. 340. Relying on Tesla's representations, the Court of Chancery denied the Plaintiff's emergency motions. *Id.* at 7.

[50] B4036 (Second Proxy at 87).

The court denied Tesla's Motion to Revise its opinion. First, the court considered whether the post-trial opinion could be revised under Court of Chancery Rules 54(b), 59(a), and 60(b). As the court observed, only Rules 59(a) and 60(b) allowed the court to reopen the trial record to consider newly discovered evidence existing at the time of trial. Because the Second Stockholder Vote came after trial, the court could not consider it under the Rules. The court also turned away the Defendants' attempt to revise the judgment under Rule 54(b). The court concluded that, although the law-of-the-case doctrine does not necessarily preclude the court from revisiting its prior adjudication, a new fact developed by the Defendants solely for the purposes of reversing a judicial ruling cannot change the outcome of that ruling.

Next, the court considered whether the Defendants waived the stockholder ratification argument. The court held that, as an affirmative defense, stockholder ratification can be waived if not timely raised. The court observed that, although parties have been permitted to raise affirmative defenses based on a stockholder vote that occurred during litigation, "[n]o Delaware decision . . . has ever allowed a party to raise the defense of stockholder ratification after trial for the purpose of persuading the court to alter (much less flip) its judgment."[51] Consequently, the

---

[51] *Ratification and Fee Op.* at 1229–30.

19

court declined to permit the Defendants to raise the affirmative defense of stockholder ratification months after the court had issued its post-trial opinion.

The court also examined the merits of the stockholder ratification argument. According to the court, stockholders can express their view, through an affirmative vote, that a corporate act is consistent with their interests. As the court held, this kind of "fiduciary ratification" may have different effects depending on context, including serving as a complete defense, changing the standard of review, shifting the burden of proof, or having no effect at all. The court concluded that, because the 2018 Grant was a conflicted-controlling stockholder transaction, fiduciary ratification was insufficient to address the risks to minority stockholders. The court also dismissed the Defendants' arguments that the transaction satisfied the so-called *MFW* framework, which required approval by an independent, disinterested, and fully empowered special committee and an effective majority-of-the-minority vote before any economic negotiations began.

Finally, the court rejected the stockholder ratification argument because it concluded that the Second Proxy was materially misleading. The court identified what it found to be several materially false or misleading statements, many of which echoed the Defendants' legal positions in their motion to revise. The court

determined that the Second Proxy's hedging statements were insufficient to counteract the effects of the defective disclosures.[52]

### 6. *Attorneys' Fees.*

After the court denied the Defendants' Motion to Revise, it considered the Plaintiff's counsel's fee petition. Applying the factors from *Sugarland Industries, Inc. v. Thomas*,[53] and to avoid a windfall, the court adopted the grant-date-fair-value approach, which valued the benefit of the rescission at $2.3 billion. The court applied a 15% baseline percentage to the $2.3 billion litigation benefit, resulting in a $345 million fee award.

### III. THE PARTIES' CONTENTIONS ON APPEAL

The Director Defendants argue on appeal that the trial court made two legal errors in determining that rescission was warranted: (1) finding that rescission could restore Musk, Tesla, and the stockholders to the *status quo ante*, and (2) improperly placing the burden on the Defendants to establish a viable alternative to total rescission of the award. The Plaintiff responds that the "Defendants failed to (i) timely and directly object to rescission as a legally improper remedy, (ii) identify

---

[52] *Id.* at 1234–35.

[53] 420 A.2d 142 (Del. 1980).

21

any legal error in the trial court's granting of rescission, or (iii) carry their burden of identifying an alternative remedy."[54]  We expand on their arguments below.

### A. *The Status Quo Ante Arguments.*

First, the Defendants argue that for rescission to be proper, "[t]he rescinding party must restore everything of value it has received under contract from the party."[55]  Here, the Defendants contend that rescission is an improper remedy because it is impossible to restore the *status quo ante* for any party to the transaction. The Defendants argue that the Court of Chancery erred in considering only the unexercised stock options in its analysis of whether restoring the parties to the *status quo* was feasible.  They identify several ways in which rescission would not restore the parties to their prior positions.[56]

In response, the Plaintiff argues that the Defendants inaccurately cast rescission as requiring a literal *status quo ante* restoration, which they find "foreign to the strictures of equity."[57]  The Plaintiff emphasizes that rescission is justified as

---

[54] Answering Br. 84.

[55] Director Defendants' Reply Br. 24 (quoting *Geronta Funding v. Brighthouse Life Ins. Co.*, 284 A.3d 47, 63–64 (Del. 2022)).

[56] Director Defendants' Opening Br. 49–50 ("Musk cannot 'unscramble' the years of work he did . . . . Nor can Tesla's stockholders return the benefits they received from Musk's performance . . . . Tesla cannot be returned to a status quo where an incentive structure valued at $2.3 billion was sufficient to compensate Musk for 10 years of future service . . . .").

[57] Answering Br. 87 & n.85 (citing *Detroit Med. Ctr. v. Provider Healthnet Servs., Inc.*, 269 F.Supp.2d 487, 496 (D. Del. 2003) ("Under Delaware law, rescission requires the *substantial* rather than the complete restoration of both contracting parties to their respective positions before executing the contract." (emphasis added))).

22

a "reasonable and appropriate"[58] remedy because no third-party interests are implicated, the entire 2018 Grant sits "unexercised and undisturbed,"[59] and rescission would restore Tesla to its original position by reversing a $2.3 billion accounting charge that the company had incurred when it approved the 2018 Grant.[60] As to their argument that rescission would restore Tesla, at least substantially, to its original position, the Plaintiff cites the benefits of reversing both the 8% dilution of Tesla's share price that was caused by the 2018 Grant[61] and the historic accounting charge that Tesla recorded when the options were granted.[62]

The Defendants dispute that rescission "restore[s] *any* of [the parties] to positions remotely resembling their positions in 2018."[63] They argue that the court's rescission remedy cannot restore Musk to the *status quo ante* in 2018 because he cannot reclaim the six years of time and effort spent achieving the 2018 Grant's milestones.[64] The Defendants also argue that rescission does not restore Tesla stockholders to their *status quo ante* position because the court's remedy does not

---

[58] *Id.* at 87 (quoting *Lenois v. Lawal*, 2017 WL 5289611, at *20 (Del. Ch. Nov. 7, 2017)).

[59] *Id.* (quoting *Post-Trial Op.* at 448).

[60] *Id.* at 88 (citing A2848 (Reply Br. in Further Support of Application for an Award of Fees and Expenses at 10); B3828 (Joint Decl. of Lucian Bebchuk & Robert J. Jackson, Jr. ¶ 62)).

[61] *Id.* (citing A2848 (Reply Br. in Further Support of Application for an Award of Fees and Expenses at 10)).

[62] *Id.* (citing B3828 (Joint Decl. of Lucian Bebchuk & Robert J. Jackson, Jr. ¶ 62)).

[63] Director Defendants' Reply Br. 26.

[64] *Id.* at 25 ("[U]nder the Court of Chancery's rescission remedy, he will be paid zero and cannot reclaim those years of time and effort.").

require them to return Tesla's stock price gains that resulted under Musk while the award was in effect.[65] Lastly, the Defendants contend that Tesla cannot be restored to its *status quo ante* position because, while it potentially benefited from reversal of the 2018 Grant's accounting charge, the massive increase in Tesla's value prevents Tesla from being restored to its 2018 negotiating position with Musk.[66]

The Defendants disagree with the Court of Chancery's finding that Musk's pre-existing equity stake is relevant to the rescission analysis. They argue that it is "irrelevant" to the rescission analysis because it does not operate as consideration for his labor following approval of the 2018 Grant.[67] Furthermore, in accepting the 2018 Grant, the Defendants argue that Musk agreed to "exchange his labor for the opportunity to acquire *additional* equity on *top of* his preexisting equity stake."[68] Therefore, rescinding the 2018 Grant after Musk had met the terms of the deal would be an inequitable outcome "contrary to common sense." [69]

---

[65] *Id.*

[66] *Id.* at 25–26 ("[T]he cost of compensating Musk for his work between 2018 and 2024 would be dramatically greater today than it was in 2018." (citing Tesla, Inc.'s Opening Br. 52 (describing how any accounting benefits that result from a rescission of the award will likely be offset by a replacement compensation package))).

[67] Director Defendants' Opening Br. 50 (citing *Ravenswood Inv. Co., L.P. v. Est. of Winmill*, 2018 WL 1410860, at *21 n.188 (Del. Ch. Mar. 21, 2018)).

[68] *Id.*

[69] *Id*. at 50–51.

The Plaintiff responds that Musk's significant preexisting stake in Tesla, which generated "tens of billions of dollars,"[70] and the fact that he was still under his 2012 Grant until 2022,[71] suffice to show that he was fairly compensated for his services during this time. Additionally, the Plaintiff points to Musk's failure to seek additional compensation under *quantum meruit* as evidence that he was fairly compensated for his services and thus restored to his *status quo ante* position.[72]

## B. *The Burden of Proof Arguments.*

Next, the Defendants argue that the Court erred in its finding that it was their burden to identify a viable alternative remedy to rescission. They maintain that if this burden belonged to them, then it would be "impossible" to concurrently argue that the original deal was "fair" and defend an alternative compensation package.[73] They argue that, because the burden of establishing an entitlement to rescission is on the party seeking rescission,[74] it would be the same parties' burden to identify an alternative remedy, which, here, would be a fair value of the 2018 Grant that could support partial rescission. Therefore, the Plaintiff's failure to identify a partial

---

[70] Answering Br. 87.

[71] *Id.* (citing A0728 (Ehrenpreis Cross-Examination at 73:14–75:03) (testifying that when the 2018 Grant went into effect, Musk still had one tranche of the 2012 Grant that had not been met)).

[72] *Id.* at 87–88.

[73] Director Defendants' Opening Br. 51.

[74] *Id.* (citing *ENI Holdings, LLC v. KBR Grp. Holdings, LLC* for the proposition that it was the Plaintiff's burden to establish an entitlement to rescission. 2013 WL 6186326, at *24 (Del. Ch. Nov. 27, 2013)).

rescission, or alternative remedy, should not mean that the equitable result is a complete rescission of the 2018 Grant.[75]

The Plaintiff disputes the argument that presenting evidence of "fairer" compensation would have put the Defendants in an impossible situation. Instead, he argues that alternative arguments are "routine in litigation" and that the Defendants' "swing[ ] for the fences" strategy left the trial court with no basis to uphold any part of the 2018 Grant.[76] The Plaintiff also contends that the Defendants waived their objection to rescission. He argues that because the Defendants did not argue that rescission was improper until their post-trial supplemental reply brief, and then only in response to the Plaintiff's disclosure violations argument, they did not properly raise the issue below and therefore, it is waived on appeal.

## IV. STANDARD OF REVIEW

This Court reviews *de novo* whether an equitable remedy exists or was applied using the correct standards.[77] Factual determinations and application of the facts to the correct standards are reviewed for whether the trial court exceeded its

---

[75] *Id.* at 51–52.

[76] Answering Br. 90–91.

[77] *SIGA Techs., Inc. v. Pharmathene, Inc.*, 67 A.3d 330, 341 (Del. 2013) (citing *Schock v. Nash*, 732 A.2d 217, 232 (Del. 1999)).

discretion.[78]  In fashioning remedies, this Court reviews whether the court exceeded its discretion.[79]

## V. ANALYSIS

Although the Justices have varying views on the liability determination, we agree that rescission was an improper remedy and therefore choose that narrower path to resolve this appeal.[80]  As explained below, we reverse because: (i) Musk could not be restored to the *status quo ante* after working six years to meet the 2018 Grant's market capitalization and operational milestones; (ii) his existing equity value increase based on his 2009 and 2012 Grants did not substitute for his return to the *status quo ante*; and (iii) it was not the Defendants' burden to prove that the parties could be placed in the same position before Musk's performance.

### A. *The Defendants Did Not Waive Their Rescission Arguments.*

First, we address the procedural matter of waiver.  The Plaintiff argues that the Defendants waived their rescission arguments by waiting until their post-trial

---

[78] *Id.*

[79] *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*, 817 A.2d 160, 175 (Del. 2002).

[80] Oral Argument at 49:00–52:54.  The Defendants offered three paths this Court could adopt.  *Id.* First, overturning the Court of Chancery's application of entire fairness; second, holding rescission was an improper remedy; or third, finding that the Second Stockholder Vote ratified the transaction.  *Id.*  As the Defendants' counsel explained: "Which of those three paths it takes is obviously up to the Court.  If it's either rescission or ratification, either of those is a very straightforward way to resolve the case.  The appeal is over.  The Plaintiff's lawyers get a *quantum meruit* fee and we're done.  I think that all three of those are independent paths to reaching the right result, which is whatever the Court says, the result below can't stand."  *Id.* at 52:23–54.

27

supplemental reply brief to raise the issue.[81]  Under Delaware Supreme Court Rule 8, "[o]nly questions fairly presented to the trial court may be presented for review; provided, however that when the interests of justice so require, the Court may consider and determine any question not so presented."[82]  Although the Court may review the trial court's decision for plain error for issues not raised below, "[t]he Court will generally decline to review questions on appeal 'unless they were first fairly presented below.'"[83]  In the Court of Chancery, an issue not raised in post-trial briefing is waived, "even if it was properly raised pre-trial."[84]  Our Court has found that a party may preserve claims by referring to them in post-trial briefing and arguments.[85]

In the preliminary statement of their post-trial answering brief, the Defendants objected to both the Plaintiff's original remedy of rescinding the first three tranches of the 2018 Grant and his alternative remedy of rescission of the entire Grant, stating that the outcome would be "inequitable."[86]  In their post-trial supplemental reply

---

[81] Answering Br. 84–85.

[82] Supr. Ct. R. 8.

[83] *In re Oracle Corp. Deriv. Litig.*, 339 A.3d 1, 17–18 n.76 (Del. 2025) (quoting *Ravindran v. GLAS Tr. Co. LLC*, 327 A.3d 1061, 1078 (Del. Sep. 23, 2024)).

[84] *Oxbow Carbon & Mins. Holdings, Inc. v. Crestview-Oxbow Acquisition, LLC*, 202 A.3d 482, 502 n.77 (Del. 2019).

[85] *See*, *e.g.*, *Holifield v. XRI Investment Holdings LLC*, 304 A.3d 896, 936–37 (Del. 2023).

[86] A1595–96 (Director Defendants' Answering Post-Trial Br. 6–7).

28

brief, the Defendants were more explicit in their objection to rescission, briefing the argument in a subsection titled, "Rescission Is Not Appropriate Here."[87]

Ordinarily, we would be reluctant to find that an issue was fairly raised in the trial court when the issue was not addressed in the main post-trial briefs, relies on a cursory reference in a post-trial opening submission, and was raised in a supplemental submission directed at unrelated issues.[88] Here, however, the Court of Chancery understood and addressed the argument being made on appeal. As the court stated in its decision, the "Defendants argue that rescission is a harsh consequence that would leave Musk uncompensated."[89] On the burden of proof issue, the court also observed that the Defendants "have not offered a viable alternative short of leaving the Grant intact"[90] and therefore "there is nothing in the record to allow the court to fashion a remedy that would order recission only to the

---

[87] A1743–44 (Director Defendants' Supp. Reply Br. 7–8) ("Rescission would not be appropriate here in any event.").

[88] The court's February 22, 2023 letter requested supplemental briefing on the following topics: whether (a) a single material disclosure invalidates the Grant; (b) the "give and get" approach was the correct approach for the fair price analysis; (c) the give and get disclosures were fully disclosed which might render the Grant development process disclosures less material; and (d) the defendants wished to respond to an *amicus curiae* submission. B4445–47 (Feb. 22, 2023 Letter from the Court to Counsel re Supplemental Briefing).

[89] *Post-Trial Op.* at 547.

[90] *Id.*

extent the Grant was unfair."[91]  Where, as here, the trial court has addressed in its decision the issues raised on appeal, the arguments on appeal are not waived.[92]

## B. *The Plaintiff Sought Only Equitable Rescission.*

Plaintiff sought only one remedy – equitable rescission.  The Court of Chancery made this clear: "[a]s a remedy, Plaintiff only seeks rescission."[93]  The court noted that the "Plaintiff sought alternative remedies but has abandoned those requests."[94]  As his lead argument, the Plaintiff asserted that rescission was warranted due to faulty disclosures.  The court stated that the argument "does not work."[95]  The court, therefore, based its rescission award on the Plaintiff's secondary argument that rescission was warranted in light of the fiduciary breaches.

Although the Plaintiff argued that "'at minimum,' the court should rescind the options for the first three tranches given the lack of disclosure regarding the probability achievement,"[96] the court concluded that "there is nothing in the record

---

[91] *Id.* at 548.

[92] *See Origis USA LLC v. Great Am. Ins. Co.*, __ A.3d __, 2025 WL 2055767, at *14 (Del. 2025). In *Origis*, although the Superior Court concluded that the insured's advancement argument was waived, "[g]iven that the trial court did address the Insureds' advancement argument, we conclude[d] it ha[d] not been waived." *Id.*; *see also id.* at *13 n.76 ("We note that, in some circumstances, the trial court addressing an issue on the merits may be sufficient to fairly present it to the trial court and enable this Court's review on appeal.").

[93] *Post-Trial Op.* at 544.

[94] *Id.* at 544 n.905 (citing A1503–05 (Plaintiff's Post-Trial Br. 104–06)).

[95] *Id.* at 544.

[96] *Id.* (quoting A1504 (Plaintiff's Post-Trial Br. 105)).

30

to allow the court to fashion a remedy that would order rescission only to the extent the Grant was unfair."[97]  It placed its inability "to identify any logically defensible delta between the unfair Grant and a fair one," on the Defendants' failure to prove what amount was fair.[98]

### 1. *Rescission as a Remedy.*

Rescission is a remedy designed to end (rescind) legal relations created by valid or voidable contracts, and can be sought at law or in equity.[99]  Generally, "rescission seeks to 'unmake' an agreement" or transaction and return the parties to the *status quo ante*.[100]  In Delaware, legal rescission is awarded by courts of law to invalidate a contract and award the plaintiff money or property of which they have been deprived.[101]

By contrast, equitable rescission awarded by a court of equity can provide further equitable relief such as the "cancellation of a valid instrument—the formal annulment or setting aside of an instrument or obligation."[102]  Through cancellation

---

[97] *Id*. at 548.

[98] *Id*.

[99] *See Geronta Funding v. Brighthouse Life Ins. Co*., 284 A.3d 47, 61 (Del. 2022) (citing *Ravenswood*, 2018 WL 1410860, at \*21).

[100] DONALD J. WOLFE, JR. & MICHAEL A. PITTENGER, CORPORATE AND COMMERCIAL PRACTICE IN THE DELAWARE COURT OF CHANCERY § 12.04[a], at 12-58 (2017).

[101] *Id*. § 12.04[a], at 12-58–59.

[102] *Ravenswood*, 2018 WL 1410860, at \*21; *see also Geronta*, 284 A.3d at 61 ("[R]escission results in abrogation or 'unmaking' of an agreement, and attempts to return the parties to the status quo" (quoting *Norton v*. *Poplos*, 443 A.2d 1, 4 (Del. 1982)).

of an instrument, document, obligation, or other matter "affecting plaintiff's rights and/or liabilities," equitable rescission restores the plaintiff to her original position by reestablishing title or recovering possession of property.[103] In Delaware, the Court of Chancery's subject matter jurisdiction over claims for rescission is "limited to actions for *equitable* rescission . . . ."[104] Equitable rescission is at issue on this appeal. It was the only form of relief sought by the Plaintiff, and it was what the court ordered.

Equitable rescission can be ordered in cases when the Plaintiff could be exposed to third-party liability if the instrument at issue were not invalidated by the court, or if the "unwinding of a transaction calls for the restoration of unique, specific property from one party to another."[105] Equitable rescission can be sought on numerous grounds, including for breach of fiduciary duty. If asserted, the complaint must demonstrate that, because of specific circumstances, rescission is "necessary to provide full and fair relief."[106] A plaintiff seeking equitable rescission bears the burden of establishing (1) equitable rescission as a viable remedy and (2) the court can restore all of the challenged transaction's parties to the *status quo ante* (*i.e.*, the

---

[103] WOLFE & PITTENGER, note 100, § 12.04[a], at 12-59 (quoting *E.I. DuPont De Nemours & Co. v. HEM Rsch., Inc.*, 1989 WL 122053, at *3 (Del. Ch. Oct. 13, 1989)).

[104] *Id.*

[105] *Id.* § 12.04[a], at 12-60.

[106] *Id.* § 12.04[a], at 12-61.

position they occupied before the transaction).[107]  Furthermore, a claim for relief pleaded in the alternative to equitable rescission is permissible if included in the pleading's demand.[108]

Because rescission requires a "mutual return to the *status quo*,"[109] the impracticability or impossibility of returning to the *status quo ante* can defeat a rescission remedy.[110]  Delaware courts have recognized impracticability of the remedy when a transaction's complexity makes it impracticable to unwind, or "impossible to 'unscramble the eggs.'"[111]  In a complex commercial transaction, such as a merger or other form of business acquisition, obstacles in unwinding the transaction such as tax ramifications, accounting issues, or the undoing of a business reorganization may make rescission impossible and thus, the court will not grant it

---

[107] *Creative Rsch. Mfg. v. Advanced Bio-Delivery LLC*, 2007 WL 286735, at *7 (Del. Ch. Jan. 30, 2007) ("The party seeking rescission bears the burden of establishing that the court can restore the status quo between the parties."); *Microsoft Corp. v. Amphus, Inc.*, 2013 WL 5899003, at *20 (Del. Ch. Oct. 31, 2013) (same).

[108] Ct. Ch. R. 8(a)(3).

[109] *Ravenswood*, 2018 WL 1410860, at *20.

[110] WOLFE & PITTENGER, note 100, § 12.04[a], at 12-67.

[111] *Gimbel v. Signal Cos.*, 316 A.2d 599, 603 (Del. Ch. 1974) (quoting *Metro-Goldwyn-Mayer Inc. v. Transamerica Corp.*, 303 F. Supp. 1344, 1348 (S.D.N.Y. 1969)), *aff'd*, 316 A.2d 619 (Del. 1974).

as a remedy.[112]   Assessing the feasibility of rescission depends on the current circumstances of the challenged transaction.[113]

The court is not required to grant rescission as it is a matter within its discretion.[114] Even if it were not impractical to unwind the transaction, the Court of Chancery has declined to grant rescission when it concludes that the remedy would be inequitable under the circumstances.[115]   On certain occasions, the court has declined to order rescission when the amount of elapsed time between the transaction and the proposed remedy was too long.[116]   Because it is the unmaking of an

---

[112] *Id.* (noting "tax consequences, accounting practices, business reorganizations, management decisions concerning capital investments, dividends, etc." as potential obstacles to rescission).

[113] *See Winston v. Mandor*, 710 A.2d 831, 833–34 (Del. Ch. 1996) (listing various factors that pertain to feasibility of a transaction's rescission, including "the time elapsed since completion of the challenged transaction; the complexity of that transaction, and thus the difficulty of undoing it; whether the transaction involves publicly traded securities and the percentage and number of such shares in public hands; possible unfair prejudice to the defendant(s) if the transaction were rescinded.").

[114] *See Gotham Partners*, 817 A.2d at 174.

[115] *Nebel v. Sw. Bancorp., Inc.*, 1995 WL 405750, at *7 (Del. Ch. July 5, 1995) (finding that a technical violation of Section 262 did not warrant rescission of a merger); *Craft v. Bariglio*, 1984 WL 8207 (Del. Ch. Mar. 1, 1984) (citing delay in rescission request and ongoing business thereafter as grounds to deny rescission).

[116] *See, e.g.*, *Sunrise Ventures, LLC v. Rehoboth Canal Ventures, LLC*, 2010 WL 363845, at *7–8 (Del. Ch. Jan. 27, 2010) ("It would be impossible more than four years after the fact for this court fairly and *equitably* to rescind a complex real estate deal . . . ." (emphasis added)), *aff'd*, 7 A.3d 485 (Del. 2010) (TABLE); *Cobalt Operating, LLC. v. James Crystal Enter., LLC.*, 2007 WL 2142926, at *29 (Del. Ch. July 20, 2007) ("Rescission of a transaction like this, nearly five years after it was consummated would be an extraordinary remedy . . . . As a result, there is no legal or equitable basis to limit Cobalt to a rescission remedy.").

agreement, rescission is an extreme remedy and should only be granted by a court of equity when it is "clearly warranted."[117]

Finally, the party seeking rescission "cannot be permitted to derive all possible benefits from the transaction and then, when he is called upon to comply with its terms, claim to be relieved of his obligation . . . ."[118] Instead, "there must be a restoration of the *status quo ante*, not only of the plaintiff but of the defendant as well."[119] When the court cannot "realistically effectuate a decree which would restore the parties to the status that existed as of the time the contract of sale was executed" then rescission will be denied.[120]

### 2. *Equitable Rescission and Rescissory Damages.*

Rescissory damages are the economic equivalent of rescission and are "only available in cases where rescission is warranted but not feasible."[121] Rescissory damages are not equitable in nature because they do not return the aggrieved party to her original position. Rather, rescissory damages are a form of legal relief that monetarily approximates the remedy of rescission. In Delaware courts, rescissory

---

[117] *Ravenswood*, 2018 WL 1410860, at *22 (quoting *Sunbelt*, 2010 WL 26539, at *14).

[118] *Craft*, 1984 WL 8207, at *11.

[119] *Id.* at *12.

[120] *Id.* at *13.

[121] *Ravenswood*, 2018 WL 1410860, at *23; *Gotham Partners*, 855 A.2d at 1072 ("Rescissory damages are designed to be the economic equivalent of rescission in a circumstance in which rescission is warranted, but not practicable. A solid body of case law so holds."); *aff'd*, 840 A.2d 641, 2003 WL 22998803 (Del. Dec. 18, 2003) (TABLE).

damages often come up in the corporate merger and acquisition context when rescission of the transaction is not available but when the plaintiffs have successfully argued a fiduciary duty breach and another 'appraisal-type' remedy is not adequate.[122]

Although the Court of Chancery has discussed rescissory damages as a remedial possibility in various merger contexts, the court has been "extremely reluctant to award such damages," often because of the plaintiff's failure to meet the requisite evidentiary burden.[123]  Despite that reluctance, this "Court has suggested . . . that it is the preferred remedial measure when a transaction fails to meet the burden of entire fairness" and rescission is not available.[124]  Here, the Plaintiff did not seek rescissory damages – only equitable rescission.

## C. *Rescission Was Improper Because The Status Quo Ante Was Neither Possible Nor Equitable.*

As a remedy for fiduciary breaches by Musk and the Director Defendants relating to approval of the 2018 Grant, the Court of Chancery ordered rescission of the entire 2018 Grant.  We hold that the Court of Chancery erred in finding that rescission was both "reasonable and appropriate" for two reasons – first, the court

---

[122] WOLFE & PITTENGER, *supra* note 100, § 12.04[a], at 12-73.

[123] *Id.* § 12.04[a], at 12-73–74.

[124] *Id.* § 12.04[a], at 12-74.  *But see Cinerama, Inc. v. Technicolor, Inc.*, 663 A.2d 1134, 1144 (Del. Ch. Oct. 6, 1994) ("[R]escissory damages should never be awarded against a corporate director as a remedy for breach of his duty of care alone; [although] that remedy may be appropriate where a breach of the duty of loyalty has been found . . . ."), *aff'd*, 663 A.2d 1156 (Del. 1995).

36

could not restore all the parties substantially to their *status quo ante* positions; and second, Musk's existing equity stake could not serve as substitute consideration to restore the parties to the *status quo ante*. The court also erred in faulting the Defendants for not proposing an alternative remedy.

### 1. *Musk Cannot Be Restored to his Pre-2018 Grant Position.*

The Court of Chancery erred in awarding rescission because **all** parties to the transaction could not be restored to their *status quo ante*. First, there are a few points the Defendants do not challenge. The Defendants do not argue that rescission is impossible to achieve here because of tax ramifications, accounting issues, or other common transactional obstacles that would result from undoing the 2018 Grant.[125] The Defendants also do not challenge the Plaintiff's argument that rescission of the Grant would reverse the 8% dilution of Tesla's shares that was caused by approving the Grant.[126] Nor do they challenge that rescission would restore the approximately $2.3 billion accounting charge that Tesla incurred in 2018 related to the grant-date

---

[125] *See* Director Defendants' Opening Br. 49–50 (listing only three reasons why rescission is legally improper: Musk's spent efforts, Tesla stockholders' increased share value, and Tesla, Inc.'s inability to "be returned to a status quo where an incentive structure valued at $2.3 billion was sufficient to compensate Musk for 10 years of future service, no matter how astronomical Tesla's success").

[126] A2848 (Plaintiff's Reply Br. in Further Support of Application for an Award of Fees and Expenses, at 10) ("Removing ~8% dilution was a benefit indisputably achieved through this Action, with a roughly $50B agreed-upon value.").

valuation.[127] Instead, their argument as to Tesla focuses on whether the company could be restored to a position "remotely resembling their position[] in 2018"[128] because, given Tesla's increase in value, it cannot be restored to its 2018 negotiating posture. This argument, however, paints an incomplete picture.

Rescission is inequitable here primarily because all parties must be restored to the *status quo ante* and total rescission leaves Musk uncompensated for his time and efforts over a period of six years.[129] Since 2009, Tesla compensated Musk through stock options tied to milestones. As noted above, the parties stipulated in the pre-trial order that in 2022, Musk met all market capitalization milestones, eleven operational milestones had been achieved, and one revenue milestone (*i.e.*, $75 billion in revenue) "remained probable of achievement."[130] Tesla reported in its December 31, 2023 Form 10-K that the $75 billion revenue milestone had been

---

[127] B3828 (Joint Decl. of Lucian Bebchuk & Robert J. Jackson, Jr. ¶ 62) ("Tesla suggested using the historic accounting charge th[at] Tesla recorded when the options were granted. Tesla argued that this produced 'an accounting benefit' for the Company, and that 'when we get these . . . options back, all Tesla has the ability to do is then reverse the [accounting] charge.'" (alterations in original)).

[128] Director Defendants' Reply Br. 26.

[129] *Ravenswood*, 2018 WL 1410860, at *21 ("By ordering rescission, whether at law or in equity, the court endeavors to unwind the transaction and thereby restore *both* parties to the status quo."); *Hegarty v. American Commonwealths Power Corp.*, 163 A. 616, 619 (Del. Ch. Nov. 2, 1932) ("[I]t is fundamental that if the choice be made of rescission, there must be a restoration of the status quo ante, not only of the complainant but as well of the defendant. It is therefore necessary that the rescinding party should offer or tender such a restoration to the other, and that the court should be able to effectuate it by decree.").

[130] A0486 (Stipulation and Pre-Trial Order ¶ 276).

achieved. Since then, the Plaintiff has agreed that "[b]y January 2023, all 303,960,630 options were vested and in-the-money."[131] It is undisputed that Musk fully performed under the 2018 Grant, and Tesla and its stockholders were rewarded for his work.

### 2. *Musk's Pre-Existing Equity Cannot Be Substituted as Consideration.*

Although Musk's preexisting equity stake was a "powerful incentive" and relevant to his engagement with the company, it cannot restore Musk to the *status quo ante* because it was not consideration for the services and labor he provided under the 2018 Grant. "Consideration requires that each party to a contract convey a benefit or incur a legal detriment, such that the exchange is 'bargained for.'"[132] Since 2009, Tesla compensated Musk through performance grants. He met, or was substantially on the way to earning, the prior grants by achieving the grant milestones. The benefits from his preexisting equity stake were not the compensation he was promised if he achieved the 2018 Grant milestones.[133]

The Plaintiff also argues that, in addition to Musk's preexisting equity stake, the 2012 Grant did not expire until 2022 and thus "fairly compensated [Musk] for

---

[131] Answering Br. 24.

[132] *Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 764 (Del. 2022) (quoting *E.I. DuPont de Nemours and Co. v. Pressman*, 679 A.2d 436, 446 (Del. 1996)).

[133] *Post-Trial Op.* at 538 ("Defendants' arguments ignore the obvious: Musk stood to gain considerably from achieving the Grant's market capitalization milestones (over $10 billion for each $50 billion increase in market capitalization).").

his services."[134]  But the Plaintiff does not explain what makes it fair compensation, especially considering the significant difference in milestones and compensation promises between the 2012 and 2018 Grants.  For rescission to be proper, "the exchange of consideration has to be reversed,"[135] and, here, rescission of the 2018 Grant does not restore Musk's consideration of six years of work as Tesla's CEO.

It is settled that "past consideration" cannot support a separate promise in excess of the promisor's existing contractual obligations.[136]  As Williston states:

> The term 'past consideration' or 'executed consideration,' though occasionally used by the courts, is self-contradictory.  Consideration, by its very definition, must be given in exchange for a promise or, at a minimum, in reliance upon a promise.  Accordingly, something that has been given before the promise was made and, therefore, was neither induced by the promise nor paid in exchange for it, cannot, properly speaking, be sufficient, valid, legal consideration.[137]

Thus, Musk's prior compensation arrangements cannot solve the problem of awarding a remedy which deprives him of all compensation that he earned for six years under a new contract.[138]

---

[134] Answering Br. 87.

[135] WOLFE & PITTENGER, note 100, § 12.04[a], at 12-58; *see also Norton v. Poplos*, 443 A.2d 1, 4 (Del. 1982) ("[T]he equitable remedy of rescission results in abrogation or 'unmaking' of an agreement, and attempts to return the parties to the status quo.").

[136] Williston on Contracts § 8:13 (4th ed.).

[137] *Id*. (footnotes omitted); *see also Continental Ins. Co.* v. *Rutledge & Co., Inc.*, 750 A.2d 1219, 1232–33 (Del. Ch. 2000) (past consideration cannot form the basis for a binding contract).

[138] Relying on *Lynch v. Vickers Energy Corp.*, 429 A.2d 497 (Del. 1981), the Court of Chancery observed that rescission is "the preferrable remedy" for breach of fiduciary duty when one party has materially misled and induced a party to enter a contract.  In *Lynch*, however, our Court noted

### 3. *The Court of Chancery Erred in Requiring Defendants to Offer a Viable Alternative to Rescission.*

The court found that rescission of the entire 2018 Grant was an appropriate remedy, and not a harsh consequence, because the Defendants did not offer a viable alternative to leaving the entirety of that Grant intact.[139] Faulting the Defendants' unwillingness to "offer[] a viable alternative," the trial court found that their "fail[ure] to identify any logically defensible delta between the unfair Grant and a fair one" was fatal to the court's ability to fashion a remedy of partial rescission.[140] Although the Defendants did not argue an alternative to entire fairness of the 2018 Grant, their failure to do so did not prevent the court from fashioning a different remedy or more limited form of rescission.

In *Gotham Partners, L.P. v. Hallwood Realty Partners, L.P.*,[141] in a breach of the duty of loyalty context, this Court characterized the Court of Chancery's powers as "complete to fashion any form of equitable and monetary relief as may be appropriate."[142] The court here determined that it could *not* order a remedy short of

---

that rescission would be appropriate "if the controversy in its present form had been here in an earlier stage of the litigation . . . ." *Id*. at 501. Like here, however, the lapse of time made "rescission [] not feasible at this late date." *Id*. Instead, the Court remanded to determine rescissory damages.

[139] *Post-Trial Op.* at 547–48.

[140] *Id.* at 548 ("[T]here is nothing in the record to allow the court to fashion a remedy that would order recission [sic] only to the extent the Grant was unfair.").

[141] 817 A.2d 160 (Del. 2002).

[142] *Id.* at 176 (quoting *Weinberger v. UOP, Inc.*, 457 A.2d 701, 714 (Del. 1983)).

total rescission because there was "nothing in the record" from the Defendants to support what would constitute a 'fair' grant.[143]   In other words, the Court of Chancery found that nothing in the record allowed the court to fashion a different remedy.

That was not a problem of the Defendants' making.  It was the Plaintiff's burden to establish an entitlement to rescission as a *form* of relief and his entitlement to any alternative remedies.[144]   The Plaintiff argued at one point that, in the alternative to rescinding the entire grant, the court should rescind only the 2018 Grant's first three tranches.[145]   But the Plaintiff abandoned that argument, and the court subsequently concluded it did not have a basis to fashion any remedy other than to rescind the *entire* 2018 Grant.  The Court of Chancery erred in assigning to the Defendants the burden to identify a viable alternative because it always remained the Plaintiff's burden to satisfy the prerequisites for any form of relief awarded.[146]

---

[143] *Post-Trial Op.* at 548.

[144] WOLFE & PITTENGER, note 100, § 12.04[a], at 12-66 ("In an action for rescission, the plaintiff bears the burden of establishing that it is possible for the court to place her or him in the status quo."); *Metro Storage Int'l LLC v. Harron*, 275 A.3d 810, 859 (Del. Ch. 2022) ("A plaintiff also must prove by a preponderance of the evidence that a sufficient causal linkage exists between the breach of duty and the remedy sought to make the remedy an apt means of addressing the breach."); *ENI Holdings*, *LLC*, 2013 WL 6186326, at *24.

[145] A1409 (Plaintiff's Post-Trial Br. 10).

[146] *See Brinckerhoff v. Enbridge Energy Co.*, *Inc.*, 2012 WL 1931242, at *4 (Del. Ch. May 25, 2012) (the party seeking rescission bears the burden of establishing that the court can restore the status quo between the parties), *aff'd*, 67 A.3d 369 (Del. 2013).

The court relied on *Valeant Pharmaceuticals v. Jerney*[147] in support of its finding that the Defendants had the burden of offering a viable alternative to total rescission. That case is distinguishable. In *Valeant*, the Court of Chancery considered a plan to give options to parent company executives in an entity that was to be spun-off where the executives would have no involvement in the ongoing enterprise. There, the former director and president of the company were sued, together with the former Chairman and CEO and other members of the board, after they decided to pay themselves large cash bonuses in connection with a later-aborted corporate restructuring.[148] The only non-settling defendant was the president who received a $3 million bonus.

First, unlike the rescission remedy here, the trial court in *Valeant* ordered the remedy of disgorgement of the president's $3 million bonus.[149] Disgorgement and rescission are remedies that have different purposes and prerequisites. The goal of rescission is to unwind a transaction and restore the consideration exchanged by the

---

[147] 921 A.2d 732 (Del. Ch. 2007). In *Valeant*, the Court of Chancery examined the fairness of bonuses paid to former directors and officers after a division of the company was spun-off. The court found that the decision by the directors to award the company's president a $3 million bonus was not entirely fair, and the president was required to disgorge the entirety of his bonus.

[148] The company intended to follow an IPO with a second-step tax-free spin-off. The spin-off was abandoned.

[149] For disgorgement as an equitable remedy for duty of loyalty and its differences from rescission and rescissory damages, see John C. Kairis, *Disgorgement of Compensation Paid to Directors During the Time They Were Grossly Negligent: An Available But Seldom Used Remedy*, 13 DEL. L. REV. 1, 6–15 (2011).

parties to their original positions, whereas disgorgement prevents unjust enrichment by a fiduciary who has breached their duty of loyalty.[150] "Disgorgement focuses on the defendant's gain from illegal conduct. It is the act of giving up something (such as profits illegally obtained) on demand or by legal compulsion."[151] Unlike rescission, disgorgement does not require that all parties to the challenged transaction be returned to the *status quo ante*. In *Valeant*, the president's unjust enrichment was remedied by depriving him of the bonus, and the court did not consider whether he was restored to his prior position.

Second, in *Valeant*, the court rejected limiting the director's bonus to the "extent that the bonus was unfair," finding that the director had already been adequately compensated for his years of service.[152] *Valeant* distinguishes *Technicorp International II, Inc. v. Johnston*,[153] where the court had permitted

---

[150] *See Metro Storage*, 275 A.3d at 865–66 ("[W]hen a fiduciary engages in 'acts of conscious wrongdoing and breaches of a fiduciary duty of loyalty,' the wrongdoer must 'disgorge any profit made as a result of such wrongful conduct.'") (citation omitted).

[151] *Gener8, LLC v. Castanon*, 2023 WL 6381635, at *31 n.390 (Del. Ch. Sep. 29, 2023) (quoting *TIAA-CREF Individual & Instit. Servs., LLC v. Ill. Nat'l Ins. Co.*, 2016 WL 6534271, at *10 (Del. Oct. 20, 2016)).

[152] *Valeant*, 921 A.2d at 752. In the present case, the Court of Chancery suggested that the court in *Valeant* rejected defendant's argument that it limit disgorgement "to the extent that the bonus was unfair" based upon "defendant's failure of proof." *Post-Trial Op.* at 548 (quoting *Valeant*, 921 A.2d at 752). However, the court in *Valeant* stated that "[b]ecause [the president] has failed to show that the transaction was entirely fair, it is clear that he has no right to retain any of the $3 million bonus he received." 921 A.2d at 752. As noted above, disgorgement is a different equitable remedy designed to prevent one from profiting from one's own wrongdoing. Rescission seeks to restore the parties to their respective positions before the transaction. Appellee did not seek disgorgement here.

[153] 1997 WL 538671 (Del. Ch. Aug. 25, 1997).

44

reasonable compensation for eleven years of service to unfaithful fiduciaries after stripping them of profit from their misdeeds.[154] Unlike in this case, the disgorgement of the president's entire bonus in *Valeant* was not a rescission of his *entire* compensation package. Rather it rescinded a bonus paid to management based solely on the development of a stand-alone entity. The court referred to the bonuses as "event bonuses" which "could be viewed as compensation for past services."[155] Unlike Musk, whose compensation was tied to performance and achievement of specific milestones, the bonuses in *Valeant* "were being paid to parent company managers who would have no further involvement in the 'spun' company."[156] This fact prompted the court to conclude that "[w]hen viewed from this perspective, it is difficult to see how such large bonuses could be justified."[157] By contrast, the court here rescinded the entirety of the Musk's compensation package, even though Musk had achieved all the required milestones in the six years since it was approved.

**D. *The Plaintiff is Entitled to an Award of Nominal Damages.***

Because the Plaintiff did not offer another form of appropriate relief, the most he can receive is an "assessment of nominal damages."[158] In Delaware, nominal

---

[154] *Valeant*, 921 A.2d at 752 n.47 (citing *Technicorp*, 1997 WL 538671, at *15–16).

[155] *Id*. at 749.

[156] *Id*. at 750.

[157] *Id*.

[158] *Ravenswood*, 2018 WL 1410860, at *2.

damages are the appropriate award when plaintiffs "fail[] to present any evidence upon which the [c]ourt could fashion a damages award in some other form."[159] As the court correctly observed in *Ravenswood Investment Co., L.P. v. Est. of Winmill*:

> Nominal damages are not given as an equivalent for the wrong, but rather merely in recognition of a[n] [] injury and by way of declaring the rights of the plaintiff. Nominal damages are generally assessed in a trivial amount, selected simply for the purpose of declaring an infraction of the Plaintiff's rights and the commission of a wrong.[160]

In *Ravenswood*, the court granted "nominal damages in the amount of $1" for a fiduciary-duty breach in an executive compensation context.[161] There, the Court of Chancery found that the Defendants breached their duty of loyalty with respect to options granted to certain officers. However, at trial, the plaintiff failed to present any evidence in support of its prayers for relief. Although the court acknowledged that it has significant discretion in fashioning remedies, it emphasized that it "still must have some basis in the evidence upon which to grant relief."[162] In the end, it concluded that it could only award nominal damages stating:

> While this court endeavors always to remedy breaches of fiduciary duty, especially breaches of the duty of loyalty, and has broad discretion in fashioning such remedies, it cannot create what does not exist in the evidentiary record, and cannot reach beyond that record when it finds the evidence lacking. Equity is not a license to make stuff up.

---

[159] *Id.*

[160] *Id.* at *25 (quoting *Oliver v. Boston Univ.*, 2006 WL 1064169, at *34 (Del. Ch. Apr. 14, 2006)) (alterations in original).

[161] *Id.*

[162] *Id.* at *19.

. . . . Rescission . . . does not work because the Company lacks sufficient funds to repay Defendants what they have already paid for the options—a necessary step if rescission is to perform its function of returning all parties to the status quo before the wrongful conduct occurred. For this same reason, rescissory damages are not viable either. And Plaintiff has failed to present any evidence upon which the Court could fashion a damages award in some other form. . . . Consequently, all that can be awarded is a declaration that Defendants breached their fiduciary duties and an assessment of nominal damages against each Defendant in the spirit of equity.[163]

*Ravenswood* is an example of when the Court of Chancery has awarded nominal damages in a derivative suit where the "plaintiff fails to establish entitlement to any other remedy."[164] Given the Plaintiff's failure to establish his entitlement to any other form of relief, the Plaintiff is entitled to $1 in nominal damages.

## VI. ATTORNEYS' FEES

That brings us to the attorneys' fees. The Defendants suggest that if the Plaintiff were awarded nominal damages, then his counsel would be entitled to a fee award based upon *quantum meruit*.[165] We agree. *Quantum meruit* essentially

---

[163] *Id*. at *2.

[164] Director Defendants' Reply Br. 28.

[165] Tesla, Inc.'s Opening Br. 53 ("Because the benefit conferred by this litigation is unquantifiable (or, at a minimum, Tornetta's counsel failed to introduce evidence to quantify it), a recalculation of the fee award using the *quantum meruit* approach is warranted.").

awards counsel fees based on the reasonable value of their services.[166] In certain cases, that amount can be increased.

Tesla argued that the Plaintiff's counsel's fees should be based upon a *quantum meruit* approach.[167] They also proposed four times their lodestar.[168] Although we would ordinarily remand for a reassessment of fees, we make an exception based on the length of this litigation and not to burden the Court of Chancery, which has devoted enormous time and attention to this case over many years, at great personal sacrifice. We find that the Plaintiff's counsel is entitled to a cash payment reflecting counsels' lodestar and a four times multiplier. Although the

---

[166] "[I]n the absence of a valid contract, [including in the attorney's fee context,] principles of *quantum meruit* come into play and can support a recovery under a theory of unjust enrichment." *In re Bremerton Cellular Tel. Co. Litig.*, 328 A.3d 330, 345 (Del. Ch. 2024) (quoting *Applied Energetics Inc., v. Farley*, 239 A.3d 409, 450 (Del. Ch. 2020)). The phrase *quantum meruit* is Latin for "as much as he deserves." *Marta v. Nepa*, 385 A.2d 727, 730 (Del. 1978) (citation omitted). "A *quantum meruit* recovery is a quasi-contract claim that allows a party to recover the reasonable value of his or her services if: (i) the party performed the services with the expectation that the recipient would pay for them; and (ii) the recipient should have known that the party expected to be paid." *Id*. (internal quotations omitted). "*Quantum meruit* damages are based on an objective [and] reasonable valuation of the services provided by reference to the fair market value of those services." *Id*. at 345–46 (quoting *LCT Cap., LLC v. NGL Energy Partners LP*, 2022 WL 17851423, at *4 (Del. Super. Dec. 22, 2022)) (alteration in original). "A reasonable valuation is the amount for which such services could have been purchased from one in the plaintiff's position at the time and place the services were rendered." *Id*. (internal quotations omitted). Delaware courts often rely on the factors derived from the Delaware Rules of Professional Responsibility to determine a reasonable valuation. *See, e.g.*, *id*. at 346.

[167] *See* A2494–97 (Tesla Inc.'s Answering Br. in Opposition to Plaintiff's Counsel's Request for an Award of Attorneys' Fees and Expenses at 38–41); *see also* A2515–17 (*Id*., Ex. A (*Quantum Meruit* Cases Chart)).

[168] *See Ratification and Fee Op.* at 1235 ("Defendants argue that Plaintiff's counsel should be paid in cash and receive no more than $54.5 million—which is 4x their lodestar, and about 1% of Plaintiff's request."); *id*. ("Defendants say that Plaintiff's counsel should receive no more than 4x their lodestar under the *quantum meruit* approach . . . .").

48

Plaintiff failed in his main objective of achieving a complete rescission of the 2018 Grant and received nominal damages, Tesla and its stockholders benefited by counsel's efforts.[169]

## VII. CONCLUSION

We reverse the Court of Chancery's rescission remedy and award $1 in nominal damages. The Plaintiff's attorneys are awarded fees and expenses based on *quantum meruit* and a four times multiplier and post-judgment interest on the revised fee award from December 2, 2024. Any disputes regarding fees and expenses should be brought to the Court of Chancery for resolution. Jurisdiction is not retained.

---

[169] *See, e.g. In re Invs. Bancorp, Inc. S'holder Litig.*, C.A. No. 12327, Dkt. No. 253, at 23 (Del. Ch. June 17, 2019) (TRANSCRIPT); *id.* at 13:7–9 (observing that "lessons were learned as a result of this case, and that alone is a benefit to this company and its stockholders"); *id.* at 23:11–14 (applying a *quantum meruit* approach which the court concluded would provide it "with a principled and practical way to award proper fees while promoting, or at least not undermining, proper incentives for the parties"); *id.* at 27:1–8 (ultimately awarding fees of two times the lodestar and reducing the award to account for fees incurred in addressing the lead counsel position and post-settlement issues).